James Thomas SPRADLIN,
Appellant/Respondent,

v.

CITY OF FULTON, Missouri, et
al., Respondents/Appellants.

No. 80634.

Supreme Court of Missouri,
En Banc.

Dec. 22, 1998.

256

John L. Patton, Columbia, for Appellant/Respondent.

James W. Erwin, Jeffrey R. Fink, Thompson Coburn, St. Louis, for Respondents/Appellants.

WILLIAM RAY PRICE, Jr., Judge.

This case involves a series of closed meetings conducted by the city council of Fulton in connection with a proposal by a private investment group to purchase land and develop a public golf course to be financed

through neighborhood improvement bonds. The trial court found that: 1) the city council violated section 610.021(2) because the closed meetings did not relate to the leasing of real estate by a public governmental body; 2) an award of attorney's fees was not warranted because the city council did not purposely violate the open meetings law; and 3) an injunction enjoining the city council from closing future meetings concerning the golf course is authorized by section 610.030, RSMo. We affirm.

## I.

Defendant City of Fulton, Missouri, is a municipal corporation organized as a constitutional charter city. Defendant Robert Fisher, Jr., is the city's mayor. Defendant Michael Miller was the director of administration for the city. Defendants Floyd Winingear, Dorothy Reifsteck, Dale Brady, Tom Harris, Steve Moore, Michael West, and Mike Luebbert were members of the city council at all relevant times. Plaintiff James Thomas Spradlin is a citizen and resident of the city.

The city of Fulton had been interested in constructing a public golf course for several years. However, a general obligation bond issue for the construction of a golf course was rejected by Fulton voters in February 1993. In 1994 an investment group, Callaway County Golf Partners, L.L.C. (CCGP), submitted a proposal to the city through Mike Miller concerning the golf course. According to the proposal, CCGP would purchase land from a third party and develop the golf course and a housing subdivision surrounding the course. The city's role in the proposal was to assist in negotiating the real estate transaction and to finance the development of the golf course and related facilities through $3.1 million in neighborhood investment district bonds. The financ-

ing arrangement included the lease of the golf course by the city. The proposal also required the city to annex the property, make any necessary rezoning changes, provide utilities to the golf course and residential area, construct and pave a county road to the residential entrance, share half the cost of a new deep well, and assume 100% of the ongoing maintenance of the well. Under the golf course lease, CCGP would manage the course, receive all profits, and upon repayment of the bonds CCGP would own the course. Mr. Miller presented the proposal to the city council in a closed meeting on May 24, 1994.

Between May 24, 1994, and February 14, 1995, the city council conducted thirteen closed meetings concerning the golf course proposal. For each closed meeting the city council stated that the meeting was "to discuss or deal with lease, purchase, or sale of real estate" pursuant to section 610.021(2), RSMo. The golf course proposal was discussed in varying degrees of specificity at the closed meetings. Only in the minutes of the first closed meeting of May 24, 1994 was the term "lease" expressly stated.[1] In the remaining meetings the minutes reflect that the council's discussions centered around the progress of the negotiations between CCGP and the landowner, the city's plan to use municipal bonds to finance the construction of the golf course and its facilities, and the city's other commitments relating to the proposal.

CCGP successfully purchased the property on February 6, 1995. Shortly thereafter, the property was annexed into the city by ordinance and a portion of the property was established as the Fulton Golf Course Neighborhood Improvement District. On May 31, 1995, the city enacted an ordinance authorizing the issuance of $3.1 million of taxable

---

1. The relevant portion of the May 24, 1994, closed meeting minutes provide that:
 ... An investor group consisting of sport figures are interested in investing their cash in the community by building the golf course, *leasing* it to us for one year at a time, at the end of each year, we could walk away and not have to renew. Of course all profits would go to the investors. *Mike stated that at first, it seemed like a great idea, but after further*

study, he was not as sure. Fulton has an excellent bond rating and Mike and Mayor Fisher do not want to risk that. Another strong possibility would be an architect from St. Louis, presenting an offer to Fulton by midsummer. Mike asked the council what its feelings were on this type of proposal. The council unanimously agreed to sit back, listen and proceed with studies. (Emphasis added.)

general obligation neighborhood improvement district bonds for the purpose of financing the acquisition and construction of improvements, buildings, and equipment on the property for use as a public golf course. Lastly, the city entered into a written ground lease and management agreement with CCGP.

As a result of the golf course transaction, James Spradlin, a Fulton resident and taxpayer, sued the city of Fulton and its council. Spradlin's petition contained three counts. Count I involved the legality of a neighborhood improvement district formed at the site of the proposed golf course. Count II involved the legality of the financing of the neighborhood improvement district. Counts I and II were disposed of by a second amended judgment entered by the circuit court after the matter was remanded in *Spradlin v. City of Fulton,* 924 S.W.2d 259 (Mo. banc 1996). The remaining count, at issue in this appeal, concerns whether the city council violated the Missouri Open Meetings Act, section 610.021(2), RSMo.

The circuit court concluded that the city and its council violated section 610.021(2) of the open meetings law by discussing the proposed golf course in closed executive meetings. The circuit court also issued an injunction enjoining the city council from closing future meetings and records pertaining to the golf course unless authorized by section 610.021. Lastly, the circuit court denied Spradlin's request for attorney's fees because it determined that the city and its council did not purposely violate the provisions of chapter 610. Spradlin and the city appealed.

## II.

The first issue before us is whether the city council violated section 610.021(2) of the Open Meetings Act by conducting closed meetings regarding the golf course project.

### A.

The relevant portion of section 610.021(2) provides:

> Except to the extent disclosure is otherwise required by law, a public governmental body is authorized to close meetings, records and votes, to the extent they *relate to* the following: ... (2) leasing, purchase or sale of real estate *by a public governmental body where public knowledge of the transaction might adversely affect the legal consideration therefor.* (Emphasis added).

The city contends that the meetings at issue qualified for closure under section 610.021(2) because the discussions "related to" a potential lease by the city of the golf course after the land was purchased by CCGP and developed through financing by the city.

Spradlin asserts that the meetings did not qualify for closure because the proposal was really a financing agreement disguised as a lease and because the specific terms of the lease were not discussed at the closed meetings. Instead, the meetings concerned CCGP's progress in acquiring the land and the financing of the development of the course through municipal bonds. Spradlin contends that a narrow reading of the phrase "relates to" is mandated by the open meetings law and that an expansive reading of section 610.021(2) would be required to sustain the city's position.

### B.

"It is a basic rule of statutory construction that words should be given their plain and ordinary meaning whenever possible. Courts look elsewhere for interpretation only when the meaning is ambiguous or would lead to an illogical result defeating the purpose of the legislature." *State ex rel. Maryland Heights Fire Protection District v. Campbell,* 736 S.W.2d 383, 387 (Mo. banc 1987). The phrase "relates to" is ambiguous because it is capable of being read differently by reasonably well-informed individuals. *State v. Meggs,* 950 S.W.2d 608, 610 (Mo.App. 1997). Resort to statutory construction is necessary. The ultimate guide in construing an ambiguous statute is the intent of the legislature. *Missouri Rural Elec. Co-op. v. City of Hannibal,* 938 S.W.2d 903, 905 n. 4 (Mo. banc 1997); *Connor v. Monkem,* 898 S.W.2d 89, 90 (Mo. banc 1995).

The legislature's intent with respect to section 610.021 is expressly stated in the Mis-

souri open meetings law. "Missouri's public policy favors open meetings." *City of St. Louis v. City of Bridgeton*, 806 S.W.2d 717, 718 (Mo.App.1991); *see also, Cohen v. Poelker*, 520 S.W.2d 50, 54 (Mo. banc 1975). "It is the public policy of this state that meetings, records, votes, actions and deliberations of public governmental bodies be open to the public unless otherwise provided by law. Sections 601.010 to 610.028 shall be liberally construed and their exceptions strictly construed to promote this public policy." Section 610.011, RSMo.

■ Section 610.021(2) is an exception to the open meetings law because it authorizes closed meetings when Missouri law and public policy expressly favor open meetings. Because it is an exception, section 610.011(1) mandates that the phrase "relates to" be strictly construed to ensure that the workings of government be open to the scrutiny of the public. A strict reading of section 610.021 requires a public governmental body to satisfy two prongs to qualify for closure. First, a closed meeting must relate directly to "the leasing, purchase, or sale of real estate by a public governmental body." Second, the public governmental body must demonstrate that "public knowledge of the transaction might adversely affect the legal consideration therefor." [2] Section 610.022.3 provides that meetings closed pursuant to section 610.021(2) "shall be closed only to the extent necessary for the specific reason announced to justify the closed meeting" and that "public governmental bodies shall not discuss any business in a closed meeting which does not directly relate to the specific reason announced to justify the closed meeting." Section 610.027.2 provides that the public governmental body and its members bear the burden of persuasion to demonstrate *compliance with sections 610.010 to 610.026.*

## C.

■ The evidence indicating what was discussed at the meetings in question includes minutes from the closed meetings and testimony from the city clerk and city administrator. It is sketchy at best. The minutes from the closed meetings disclose that the golf course proposal, including the housing development, was discussed in varying detail at all of the closed meetings. At all times, a lease of the golf course by the city was contemplated. The proposal ultimately did result in a lease and management agreement between CCGP and the city.

Only the minutes of the May 24, 1994 meeting actually refer to the lease. There is no indication, however, that the specific terms, negotiation, or price of the lease were discussed. Minutes of the other closed meetings do not even mention the lease and indicate only a general discussion of the project as a whole, without specific focus upon the lease or the legal considerations thereof. For example, minutes of the June 14, 1994 meeting provide that "Mike and Mayor Fisher reported on the progress of the proposed golf course project by saying that Jerry Loomis of St. Louis and his group of investors are planning on buying the land before the end of summer." The minutes of the August 9, 1994 meeting provide that "Mayor Fisher addressed the letter that was distributed to all council members on the discussion notes for the golf complex considerations. He asked all council members to read through this hand-out and at the next council meeting on 8/23/94, be ready to discuss with himself and Mike."

The city clerk testified that the discussions at the closed meetings involved the financing and construction of the golf course and the possible lease of the course by the city. The city administrator testified that the "sale or purchase or lease of property was discussed" at the closed meetings. This testimony fails *to specify which matter was discussed and* whether the "sale or purchase or lease of property" was by the city. Later, the city administrator testified that he would need to refer to the minutes to determine whether the council discussed the city's lease of the golf course in closed meetings. Clearly, the

---

**2.** Because we find that the meetings exceeded the scope of section 610.021(2), we need not address whether public knowledge of the transaction might have adversely affected the legal consideration involved in the golf course project.

testimonial evidence is too vague to be dispositive.

Based on the evidence, the city has failed to meet its burden of persuasion to demonstrate compliance with the requirements of the law. Rather, the evidence shows that the closed meetings included matters beyond the specific reason announced to justify closure, that is, the "lease, purchase, or sale of real estate" by the city. While the discussions at the closed meetings may have "related to" the city's leasing of the golf course in the broadest sense, these discussions did not qualify for closure because they did not "directly relate to the specific reason announced to justify the closed meeting." There are no exceptions in section 610.021 for discussing a real estate transaction between a private developer and a landowner, for discussing the developer's plans for the real estate, or for discussing the financing through municipal bonds of a development on real estate not yet purchased.[3]

There is reference in the July 26, 1994 minutes to "negotiations to buy the property from John Danuser for $450,000.00," and the November 8, 1994 minutes provide that "on Thursday morning the closing should be done on the Danuser property." The city administrator testified that "if we did discuss it openly and the city was involved, we were certain the price of the land would escalate." These references indicate items that might justify closed meetings had the purchase of the property been by the city. However, the property was purchased by CCGP, not the city. The exception in section 610.021(2) applies only to the leasing, purchase, or sale of real estate "by a public governmental body" and even then, only if "public knowledge of the transaction might adversely affect the legal consideration therefor."

### III.

The second issue before us is whether attorney's fees should have been assessed against the members of the Fulton city council for violating the open meetings law. Section 610.027.3 controls this issue, stating:

> Upon a finding by a preponderance of the evidence that a member of a public governmental body has purposely violated sections 610.010 to 610.027, the member may be subject to a civil fine in the amount of not more than five hundred dollars and the court may order the payment by such member of all costs and reasonable attorney fees to any party successfully establishing a violation of sections 610.010 to 610.026.

The trial court concluded that the city council did not purposely violate the law and declined to award attorney's fees to Spradlin. The trial court's ruling is consistent with *Tipton v. Barton*, 747 S.W.2d 325, 332 (Mo. App.1988), which held that "the Open Meetings Act authorizes the award of costs and reasonable attorney's fees where the court finds a public governmental body has purposely violated the Act."[4] Spradlin challenges this interpretation in a number of ways.

### A.

Spradlin first argues that the last phrase of the statute supports a reading that attorney's fees may be assessed for non-purposeful violations. The last phrase of section 610.027.3 provides that "the court may order the payment by such member of all costs and reasonable attorney's fees to any party successfully establishing a violation of sections 610.010 to 610.026." Specifically, Spradlin argues that this phrase speaks only to a "violation" not a "purposeful violation."

Spradlin, however, ignores the greater portion of the statute that sets these words in context. The statute clearly distinguishes between individuals against whom attorney's fees may be assessed and individuals to whom fees may be awarded. The statute first focuses upon individuals against whom a fine or attorney's fees may be assessed, that is, "a member of a public governmental body

---

3. Other Missouri cases applying the provisions of section 610.021(2) support this conclusion. *See State ex rel. Birk v. City of Jackson*, 907 S.W.2d 181 (Mo.App.1995); *City of St. Louis v. City of Bridgeton*, 806 S.W.2d 717 (Mo.App.1991).

4. *Compare* to *Charlier v. Corum*, 794 S.W.2d 676 (Mo.App.1990), and *Deaton v. Kidd*, 932 S.W.2d 804 (Mo.App.1996), where the use of the word "purposely" was not addressed.

[who] has purposely violated sections 610.010 to 620.027." [5] As to such an individual, the statute provides *"the* member may be subject to a civil fine ... *and"* the court may order *"such* member" to pay costs and attorney's fees. (Emphasis added.) Both the words "the" and "such" [6] obviously refer back to the member who purposely violated the statute. The conjunctive "and" makes clear that it is the same individual against whom the court may assess either or both penalties. No language in the statute allows for an assessment of the fine, costs, or attorney's fees against anyone else, let alone any member who has not "purposely violated" the statute.[7]

In contrast, the language Spradlin points to does not refer to or identify the individual against whom the attorney's fees may be assessed. It refers only to the individual to whom they may be awarded. This language does not precisely mirror the language designating against whom the award might be assessed, and here again we must acknowledge ambiguity. However, the statute simply provides the trial court no authority to assess costs and fees against anyone other than "a member of a public governmental body [who] has purposely violated [the law]," regardless of the manner in which the recipient is described.

### B.

█ Second, Spradlin urges that the policy behind chapter 610 supports his reading of section 610.027.3 and requires a finding that an award of attorney's fees should be the rule rather than the exception. He contends

that members of the public will be less likely to challenge the actions of a public governmental body if faced with expensive litigation and attorney's fees.

█ This may be so and the legislature might well consider the issue. However, "courts must give effect to the language as written." *Kearney Special Road Dist. v. County of Clay,* 863 S.W.2d 841, 842 (Mo. banc 1993). The plain language of the statute only authorizes assessment of attorney's fees against an individual upon a demonstration of a "purposeful" violation of the law. "There is no room for construction even when a court may prefer a policy different from that enunciated by the legislature." *Id.; see also Bethel v. Sunlight Janitor Service,* 551 S.W.2d 616, 620 (Mo. banc 1977) (issues of public policy must be addressed to the General Assembly).

Moreover, in many situations, statutes allowing for an award of attorney's fees are "penal in nature and must be strictly construed." *Frisella v. Reserve Life Ins. Co. of Dallas, Tex.,* 583 S.W.2d 728, 735 (Mo.App. 1979); *Hay v. Utica Mutual Ins. Co.,* 551 S.W.2d 954, 957 (Mo.App.1977); *Lummus v. Shoney's of LaPlace,* 713 So.2d 1290 (La.App. 1998); *State Farm Mutual Automobile Ins. v. Thomas,* 316 Ark. 345, 871 S.W.2d 571 (Ark.1994); *Lee McGuire 1900 Co. v. Inventive Indus.,* 566 S.W.2d 95 (Tex.Civ.App. 1978); *see also Kansas City Star Co. v. Fulson,* 859 S.W.2d 934, 939 (Mo.App.1993); *Kansas City Star Co. v. Shields,* 771 S.W.2d 101, 104 (Mo.App.1989). Statutes imposing a penalty are intended to punish the wrongdoer and deter others.[8] *See, e.g., Shields,* 771 S.W.2d at 104.

---

5. Section 610.028 provides that a public governmental body may provide for the legal defense of any member charged with violating sections 610.010 to 610.030. That section, however, fails to address whether the public governmental body may *reimburse the member for any fines, costs* or fees that the member may be ordered to pay. It is interesting that section 610.027.3 provides that fines, costs and fees may be assessed against "a member" of a public governmental body. It does not provide that they be assessed against the governmental body itself. We need not address whether these sections imply that payment of costs and fees assessed against a member of a governmental body pursuant to section 610.027.3 may not be reimbursed by the governmental body.

6. *Such* is defined as "of that kind, having particular quality or character specified, identical with, being the same as what has been mentioned. Alike, similar, of the like kind. 'Such' represents the object as already particularized in terms which are not mentioned, and is a descriptive and relative word, referring to the last antecedent." BLACK's LAW DICTIONARY 1432 (6th ed.1990).

7. Under Spradlin's interpretation, even a member of a governmental body who voted against closure might be assessed attorney's fees.

8. Section 610.027.3 allows for a maximum civil fine of $500 while no limit is placed on the amount of attorney's fees that may be assessed. It would be illogical to assume that the General

Spradlin's argument that the express statement that "Missouri's public policy favors open meetings" mandates an assessment of attorney's fees for any violation is misplaced. That policy relates directly to the portions of the law concerning the scope of the law's application to public meetings. We have given this policy full force by strictly construing the ambiguous exceptions provided by section 610.021(2). Our strict construction of section 610.021(2) mandates the broadest possible application of the law, limiting what meetings may be closed and what may be discussed in closed meetings. By contrast, the policy relates only indirectly, if at all, to the attorney's fees penalty provided in section 610.027.3. As mentioned before, the contrary policy requiring strict interpretation of penal statutes controls. This is not an issue of how broadly the law should be applied, only the harshness of the penalty. Limiting awards of attorney's fees to those instances where a "purposeful" violation is demonstrated does not render the law meaningless. Those violating the law will still be subject to having their actions voided under section 610.027.4, to an injunction barring future violations under section 610.030, and to the social and political consequences of having been found to have broken the law.

C.

Finally, Spradlin asserts that if a "purposeful" violation is necessary for an award of attorney's fees, he has satisfied this standard by demonstrating that the city intended to engage in the conduct that resulted in the violation. This interpretation, however, fails to give effect to the word "purposely" as used in section 610.027.3.[9]

■ Traditional rules of statutory construction require every word of a legislative enactment be given meaning. *Staley v. Missouri Director of Revenue,* 623 S.W.2d 246, 250 (Mo. banc 1981). Accepting Spradlin's

assertion that to "purposely" violate the statute merely requires engaging in the prohibited conduct renders the word "purposely" entirely meaningless. It would impose strict liability for any violation of section 610.027.3. Had this been the legislature's intent it would not have included the word "purposely" in the section. This indicates the legislature's intent that something more is required before subjecting individual members of public bodies to liability that could amount to tens of thousands of dollars.

■ The word "purposely" must be given its ordinary and usual meaning. *See* section 1.090, RSMo; *Abrams v. Ohio Pacific Exp.,* 819 S.W.2d 338, 340 (Mo. banc 1991). The ordinary and usual meaning of a word is derived from the dictionary. *Id.* "Purposely" is defined as "intentionally; designedly; consciously; knowingly. Act is done 'purposely' if it is willed, is product of conscious design, intent or plan that is to be done, and is done with awareness of probable consequences." BLACK'S LAW DICTIONARY 1236 (6th ed.1990). "Purpose" is defined as "that which one sets before him to accomplish or attain; an end, intention, or aim, object, plan, project. Term is synonymous with ends sought, an object to be attained, an intention, etc." BLACK'S LAW DICTIONARY 1236 (6th ed.1990).

The word "purposely" when taken in its ordinary and usual sense makes clear that more than a mere intent to engage in the conduct resulting in the violation is necessary. To purposely violate the open meetings law a member of a public governmental body must exhibit a "conscious design, intent, or plan" to violate the law and do so "with awareness of the probable consequences."[10]

■ Here, the city contends that the thirteen closed meetings "related to" the leasing of real estate by a public governmental body. As previously stated, the phrase "relates to"

Assembly would impose a greater penalty for a lower standard of wrongdoing.

9. In making this argument, Spradlin relies on both *Charlier v. Corum,* 794 S.W.2d 676 (Mo.App. 1990), and *Deaton v. Kidd,* 932 S.W.2d 804 (Mo. App.1996). However, in both of these cases the use of the word "purposely" was not addressed.

10. In *Buckner v. Burnett,* 908 S.W.2d 908, 911 (Mo.App.1995), the western district stated that "a public official's intentionally forestalling production of public records until the requestor sues would be a purposeful violation of Chapter 610 and would be subject to a fine and reasonable attorneys fees."

is ambiguous. Prior to our holding today stating that a strict and narrow reading of the exceptions to the open meetings law is required, a reasonable person could have concluded that the meetings qualified for closure and that the meetings, in a broad and general sense, "related to" the leasing of the golf course by the city. Engaging in conduct reasonably believed to be authorized by statute does not amount to a purposeful violation. Moreover, the testimony of the city administrator indicated that "if we did discuss it openly and the city was involved, we were certain the price of the land would escalate." [11] Although this testimony is not sufficiently direct to meet the city's burden of proof to justify closure of the meeting, it is sufficient to allow a finding by the trial court that those involved reasonably believed their behavior was authorized by statute.

 Our standard of review requires that we sustain a trial court's decision unless it is against the weight of the evidence or there is no substantial evidence to support it. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The power to set aside a trial court's judgment on the ground that it is against the weight of the evidence should be exercised "with caution and with a firm belief that the decree or judgment is wrong." *Id.* Despite the violation of the law, the evidence allowed a finding by the trial court that a conscious design, intent, or plan to violate the open meetings law by the city council was not established. While we may have weighed the evidence differently and arrived at a different conclusion than the trial court, we must adhere to our standard of review and are not free to substitute our own judgment for that of the trial court. *See State v. Burkhardt*, 795 S.W.2d 399, 404 (Mo. banc 1990).

Hereafter, however, members of governmental bodies are on notice that the provisions of the open meetings law will be strictly enforced and that our trial courts will have less latitude to avoid a finding of a purposeful violation.

---

11. It is reasonable to assume that if the purchaser of the property would have to pay a higher

## IV.

 The last point on appeal is whether the circuit court erred when it enjoined the city council from conducting closed meetings in the future and from closing future records concerning the golf course, unless authorized by section 610.021. When the circuit court entered the injunction, section 610.030 provided that "[t]he circuit courts of this state shall have the jurisdiction to issue injunctions to enforce the provisions of sections 610.100 to 610.115." Injunctive relief was not expressly authorized for a violation of section 610.021. However, effective August 28, 1998, the legislature repealed section 610.030 and enacted a new section 610.030 in its place. (H.B. No. 1095). The new version of section 610.030 provides that "the circuit courts of this state shall have the jurisdiction to issue injunctions to enforce the provisions of sections 610.010 to 610.115." The city does not allege that any attempt to enforce the injunction was made prior to the amendment of the statute. Accordingly, the question of whether the injunction was authorized under the previous statutory language is moot. *Bank of Washington v. McAuliffe*, 676 S.W.2d 483, 487 (Mo. banc 1984). As the statute now authorizes injunctive relief, no claim can exist that the trial court's order exceeds its jurisdiction.

The judgment of the trial court is affirmed.

LIMBAUGH, COVINGTON and WHITE, JJ., concur.

HOLSTEIN, J., concurs in separate opinion filed.

LIMBAUGH, J., concurs in opinion of HOLSTEIN, J.

WOLFF, J., concurs in part and dissents in part in separate opinion filed.

BENTON, C.J., concurs in opinion of WOLFF, J.

JOHN C. HOLSTEIN, Judge, concurring.

I concur in the principal opinion but write separately to express my reasons for reject-

---

price, the city's lease payments would increase as well.

ing the dissenting view. The dissent is wrong on at least two counts.

## I.

First is the dissent's claim that under fixed grammatical rules, which are not cited, a prepositional phrase preceding a compound sentence only applies to the first independent clause. Neither of the cases cited in the dissent on this point support this rule of grammar. *See Union Electric Co. v. Morris,* 359 Mo. 564, 222 S.W.2d 767, 770 (Mo. banc 1949); and *McDermott v. Carnahan,* 934 S.W.2d 285, 287 (Mo. banc 1996) (both cases cite various rules of statutory construction). Unless some ambiguity appears in section 610.027.3, there is no reason to rummage among the rules of statutory construction. *State ex rel. Missouri Pacific Railroad Co. v. Koehr,* 853 S.W.2d 925, 926 (Mo. banc 1993). Correct application of grammatical rules demonstrates an absence of ambiguity.

For a correct grammatical exposition similar to the statutory text here, one need look no further than our own pattern jury instructions. Those instructions are designed to be correct, complete, concise and "stated in language the average juror can understand." MAI (1996), p. LIII. The standard verdict directing instruction begins with the conditional phrase "If you believe", followed by a series of independent clauses usually conjoined by the word "and." MAI 17.01. In the pattern instructions, the conditional phrase is applicable to all conjoined independent clauses. Applying that rule here, the prepositional phrase beginning with "Upon a finding ..." applies to both independent clauses of section 610.027(3).

Grammatical hairsplitting aside, the dissent is wrong in claiming that applying the first phrase of section 610.027(3) to its second clause renders its concluding phrase redundant and meaningless. A careful reading discloses no redundancy. In the first phrase, the statutory sections referred to are sections 610.010 to 610.027. By contrast, the concluding phrase references sections 610.010 to 610.026, thereby narrowing the class of litigants eligible to recover costs and attorney fees. Only one who has established a purposeful violation of sections 610.010

through 610.026 may obtain attorney fees. The introductory phrase articulates the predicate evidentiary standard and mental state. The concluding phrase identifies and narrows those who may recover attorney fees.

The provision permitting recovery of attorney fees "to any party successfully establishing a violation of section 610.010 to 610.026" is significant. It denies recovery of any portion of the fees associated with unrelated claims raised in the same action, such as Counts I and II in this case. In addition, one who has incurred attorney fees relating to a purposeful violation of the open meetings law but who was not a party to a proceeding to enforce sections 610.010 to 610.026 may not recover those fees based on the successful prosecution of the same unlawful conduct by another. Giving full effect to both the introductory phrase and the concluding phrase does not render either meaningless or redundant.

Another unusual aspect of the dissent is its statement that section 610.027(3) is not ambiguous while simultaneously resorting to the canons of statutory construction to explain the statute's meaning. This is a striking departure from precedent. Where the language of the statute is unambiguous, there is no room for construction. *Jones v. Director of Revenue,* 832 S.W.2d 516, 517 (Mo. banc 1992). In any event, the statutory rule of liberal construction in favor of open meetings does not mean that words such as "purposely violated" or "preponderance of the evidence" be disregarded when the words create an obstacle to an open meetings claim.

## II.

I take even stronger issue with the assertion that the council members' conduct was necessarily a purposeful violation of the open meetings law. In order to support its view that defendants purposely violated the open meetings law, the dissent takes the liberty of putting its own gloss on the facts.

This Court does not perform a de novo review in a court-tried case. The judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the

weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Moreover, appellate courts should exercise the power to set aside a judgment on the grounds that it is "against the weight of the evidence" with caution and only with the firm belief that the decree or judgment is wrong. *Id.* In reviewing the facts, deference is accorded the trial court's superior opportunity ·to judge the credibility of the witnesses. Rule 73.01(c)(2). The dissent departs from these well-worn standards of review by putting its own spin on the evidence.

The evidence of what occurred at the thirteen meetings is sketchy, at best. Most of what we know about the meetings is derived from a secretary or clerk's minutes. Though the closed meetings occurred over a period of months from May of 1994 to February of 1995, the record discloses no complaint about the closure until this suit was filed in April of 1995. Most of the meetings appear to have been informational updates from private investors regarding their efforts to raise capital and to contract for property to lease to the city for a golf course. It is not wholly unreasonable to anticipate that public discussion of the development of a proposed site would drive up land prices in that area by creating "holdout" or "free rider" problems in land acquisitions. Such market changes could have increased the "legal consideration" necessary to obtain the lease to the city or subverted the transaction altogether. A nonlawyer reading the exception in section 610.021(2) might well conclude that the leasing provision justified a closed meeting. To say there is "no way" public disclosure could affect legal consideration for the lease is to ignore fundamental rules of economics.

The same sunshine that disinfects can also cause cancer. That is precisely why there are exceptions to the sunshine law. In the present case there may well have been economic factors detrimental to the city that justified closed meetings, though we cannot reach that conclusion because the process followed was so clumsy.

The fact that meetings were closed is not necessarily indicative of a conscious design to violate the law. The closure is equally indicative of a desire to let normal market processes control the cost of land and the ultimate cost to the city of its lease. Neither is the council's failure to seek legal advice or its failure to generate a record justifying the closed meetings necessarily indicative of a scheme to violate the law. Rather, it is more likely indicative of sloppy practices by the secretary, clerk, mayor or others who may well have been negligent or ignorant of the need to make a record that adequately justified closure under the statute or the consequences of failing to do so. In any event, the trial judge is in a far superior position to judge the motives of council members regarding why the meeting was closed. Regardless of my own assessment of these facts, I feel bound to affirm the decision of the trial judge because a reasonable person could have found as he did. In the face of his contrary ruling, I hesitate to ascribe improper motives to persons known to me only through the printed pages of a less than conclusive legal record.

I have no information by which to evaluate the dissent's suggestion that only a few "wealthy gadflies and caring media barons" will remain to enforce the statute after this decision. My sense, however, is that there are ample social, political and economic interests at work to ensure a steady supply of real estate dealers, land developers, local journalists, concerned citizens, and hungry lawyers to keep most city officials in compliance with the law.

For all these reasons, I cannot join the dissent.

MICHAEL A. WOLFF, Judge, concurring in part and dissenting in part.

The obvious purpose of Missouri's open meetings law is to ensure that the public's business be done in public. The law, section 610.010 to 610.028 [1] is, as section 610.011 dictates, to be "liberally construed and their exceptions strictly construed." ·

---

1. All references are to RSMo.1994 unless otherwise indicated.

Unquestionably, the Fulton city council was doing the public's business in the 13 meetings, that it closed to the public, which involved public financing for the acquisition and development of a golf course by private parties. The trial court accordingly was correct in concluding that the defendant council members violated the law. The trial court, however, did not find that the city council "purposely" violated the law; thus, under the trial court's interpretation of the statute, the court did not consider civil fines or attorneys' fees and costs.

I differ from the majority's conclusions in two important respects:

(1) The statute allows the court to consider awarding costs and attorneys' fees where defendants have violated the statute, whether "purposely" or not. The case should be remanded for the trial court to exercise its discretion to determine what attorneys' fees, if any, should be awarded to Spradlin because of defendants' violations of the law.

(2) The case should also be remanded for the trial court to reconsider its conclusion that defendant council members did not "purposely" violate the open meetings law.

I concur in the decision to uphold the finding that the council members violated the open meetings law. But, because I believe the majority's opinion misconstrues the statute's words and, thereby, severely weakens meaningful enforcement of the state's open meetings law, I respectfully dissent.

## Attorneys' Fees May Be Awarded Even If The Violation Was Not Purposeful.

The statutory standard here is not clearly written, but it is not ambiguous. Correct interpretation requires a careful reading, but the study of sentence structure taught in grade school, formerly known as grammar school, will suffice. Canons of statutory construction, taught in law school, also support a correct interpretation. The sentence in question is a compound sentence consisting of two independent clauses joined by the conjunctive "and:"

Upon a finding by a preponderance of the evidence that a member of a public governmental body has purposely violated sec-

tions 610.010 to 610.027, the member may be subject to a civil fine in the amount of no more than five hundred dollars

and

the court may order the payment by such member of all costs and reasonable attorneys' fees to any party successfully establishing a violation of 610.010 to 610.026. (Spacing provided, for emphasis.)

Section 610.027(3)

The reference to "such member" is to the antecedent phrase "member of a public governmental body." It does not include the rest of the first clause concerning the purposeful violator of the statute. "Such member" is properly read only to be an abbreviated reference to the longer descriptive phrase, "member of a public governmental body," not to the entire first clause.

Moreover, the compound sentence should be read to avoid redundancy, and to give effect to each word and phrase in the statute, as the canons of statutory construction teach us. _Union Electric v. Morris_, 359 Mo. 564, 222 S.W.2d 767, 770 (Mo.1949). If we read the statute to require a purposeful violation in order to trigger potential liability for attorneys' fees, then we render unnecessary the phrase "to any party successfully establishing a violation of sections 610.010 to 610.026." To read the statute, as the trial court and this Court's majority do, is to edit the section by ending the sentence after the word "fees." We must, after all, give effect to the statute as written, _McDermott v. Carnahan_, 934 S.W.2d 285, 287 (Mo. banc 1996), and not discard or ignore phrases that are inconsistent with the meaning we want. Even if the phrase has some utility (beyond re-stating the obvious) for determining which party in multi-party cases is to be awarded attorneys' fees, the phrase does not limit the award of fees to "purposeful" violations, but rather specifies an award to "any party successfully establishing a violation of 610.010 to 610.026."

The correct interpretation of this statute is done here without reference to the "policy" expressed in section 610.011. This interpretation is based simply on the words of the statute themselves. However, the majority

does pay homage to the policy expressed in the statute that it should be "liberally construed" with the exceptions to the statute "strictly construed" in order to "promote this public policy." After paying homage to this policy, the majority then severely weakens the statute by depriving it in most cases of the most effective means of enforcement provided by the General Assembly, that is, the provision of attorneys' fees.

The statute, as written, applies to a broadly defined category of entities under the term "public governmental body." As set forth in the statute, the requirement of open meetings and open records applies to several thousand such public governmental bodies, including every conceivable form of state and local board, commission, agency, city council, school district, sewer district, or other governmental entity.

Section 610.027 permits a public governmental body that has doubts about the legality of closing a public meeting or record or vote to request an attorney general's opinion, and the statute likewise empowers an action for enforcement to be brought by the attorney general or prosecuting attorney. But no legislative body has appropriated public funds to enforce the statute. By and large, enforcement of the statute is left to actions to be brought by "any aggrieved person, taxpayer to, or citizen of, this state, ...." *Id.* Thus, the effectiveness of the statute is almost entirely dependent upon suits by private parties, which, in turn, depend upon the availability of attorneys' fees where violations of the statute are proved. The majority's reading of the statute precludes consideration of attorneys' fees for all but the most egregious violations of the statute. Without the availability of attorneys' fees for those who prove violations of the statute, enforcement of the statute is left to wealthy gadflies and media owners who care enough to bring suit to vindicate the public's right to know.

Because there is a relative shortage of wealthy gadflies and caring media barons, the statute— mostly bereft of its principal enforcement tool— may safely be ignored by those public governmental bodies that would prefer to do the public's business in private.

I began this section by noting that the General Assembly has given us a statute that is not clearly written. That is certainly not unprecedented. In fact the lack of clarity may have been deliberate in order to make peace between contending factions and to get the legislation passed. The "sunshine side" could believe it was getting a strong law that protects the public's right to know about the conduct of the public's business. And the faction that wanted a weak, barely enforceable law— what we might call "the dark side" [2]— could see what it wanted in the legislation. The true meaning of the law, ultimately, is left to the court.

But the General Assembly can, if it wishes, have a strong sunshine law. The legislature can simply amend the provision quoted here to make it clear enough for everyone to understand that courts may award attorneys' fees where there are violations of the law, whether purposeful or not.

Or, if the General Assembly is satisfied with a weak law that remains after the result in this Court, it can leave the statute alone.

There is one aspect of the majority's reading of the statute that is likely to cause unintended mischief — that is, the majority's reading of attorneys' fees as penal in nature. Depending upon the context, an award of attorneys' fees can be viewed as punishment, for example, Rule 55.03(c)(2), for violation of this Court's rule against frivolous pleadings and motions. But in other contexts, attorneys' fees provisions simply involve the shifting of responsibility for fees and costs to a party more appropriately positioned to pay them, as in divorce litigation, for example, or to further the public policy of enforcement of particular statutory or constitutional rights, as in the Civil Rights Attorneys' Fee Act, 42 U.S.C. section 1988. Neither of the latter examples is considered penal or punitive, but simply a furtherance of public policy.

To limit attorneys' fees to situations where there are purposeful violations, and to label such fees as penal, is virtually to assure that the members of the public bodies personally

2. With no disrespect intended. *See,* George Lucas, *"Star Wars"* (Lucasfilm, Ltd.).

268

will bear the burden of such fees. If such fees are penal in nature, it may be against public policy for them to be borne by anyone other than the wrongdoer. *Crull v. Gleb,* 382 S.W.2d 17,23 (Mo.App.1964). See also *Colson v. Lloyd's of London,* 435 S.W.2d 42, 47 (Mo.App.1968) (potential chilling effect of public policy against insurance for punitive damages on law enforcement officers). On the other hand, to treat the statute simply as a fee shifting statute leaves open the possibility that the governmental entity itself could indemnify its members who are subjected to liability for attorneys' fees for violations of the statute. Cf. *State ex rel. Lack v. Melton,* 692 S.W.2d 302 (Mo.1985) (county commission entitled to use county funds to compensate outside counsel who represented it where county commission members were sued in their official as well as individual capacity), and *Dixon v. Holden,* 963 S.W.2d 306, 307 (Mo.App. W.D.1997) (state legal expense fund, which is used for payment of claims against state, state agency, or officer or employee of state or state agency, covers state employees in 42 U.S.C.A. sec.1983 suits and award of attorneys fees under sec.1988). The majority's interpretation of the attorneys' fees provision makes the possibility of being subjected to liability for attorneys' fees about as likely as being struck by lightning, but if the member of a public body is so struck, he or she is likely to bear the full brunt of the charge.

We should note that section 610.027 provides that the court "may" award attorneys' fees. Cf., *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). The determination of attorneys' fees and the proper amount is left to the discretion of the court, as is the amount "up to $500" in civil fines for purposeful violations. The fear of imposing burdensome liabilities for attorneys' fees on the part of individual members of public governmental bodies will, I believe, greatly diminish the use of attorneys' fees for encouraging remedial actions under the statute.

### Did the City Council Act Purposely?

Only once in 13 meetings was the prospect of a lease of the golf course to the city— as part of a public financing scheme— even mentioned. The council cited section 610.021(2) without, apparently, any advice of counsel or any serious attempt to justify the closure under the statutory exception.

The transactions discussed in the counsel's closed sessions are precisely the kind that need the disinfecting effects of "sunshine" mandated by the open meetings law. After the city's voters rejected a bond issue for a golf course, private developers proposed the use of the city's bonding authority in the establishment of a "Fulton Golf Course Neighborhood Improvement District" to finance the development. A lease of the golf course to the city, where the course was to be operated by the private parties for their own benefit, was simply part of the financing arrangement. The contemplated lease of the golf course to the city in no way qualified for the statutory exception: there was no showing, as the trial court found, that public knowledge would adversely affect the price of the real estate. Most of the closed council meetings did not involve lease, purchase, or sale of real estate by the city of Fulton, but by a private party. The part that affected the city and concerned plaintiff Spradlin was the proposal to use public bonds for financing the golf course development.

The obvious fear is not that the lease price will be affected by public knowledge of the impending deal, but that public exposure would enrage the citizenry and thus kill the deal.

That is precisely why we have a sunshine law.

I agree with the principal opinion that "purposely," when used in its ordinary and usual sense, means more than a mere intent to engage in conduct that violates the open meetings law, and that a member of a public governmental body "must *exhibit* a 'conscious design, intent or plan' to violate the Act and do so 'with awareness of the probable consequences.'" (principal opinion, p. 14). (Emphasis added.) The trial court thus must judge defendants' purpose by what they did, not by a "pure heart, empty head" standard of what they said.

To invoke the exception to the open meetings law for a lease, the statute states the requirement as follows:

Except to the extent disclosure is otherwise required by law, a public governmental body is authorized to close meetings, records and votes, to the extent they relate to the following:

. . . .

(2) *Leasing,* purchase or sale *of real estate* by a public governmental *body where public knowledge of the transaction might adversely affect the legal consideration therefor.* (Emphasis added.)

The statute unequivocally requires not just that the discussion "relate to" the leasing of real estate, but also that public knowledge of the transaction might adversely affect the legal consideration. The lease contemplated by this transaction is a lease to the city by the private developers of a golf course being developed with public bond financing. There appears to be no way public disclosure could affect the "legal consideration" for the lease; the lease was part of the overall financing deal involving the proposed lessor and lessee. The parties to the proposed lease were in the deal together behind closed doors. There was no market for the lease to be affected by public disclosure, for there would only be one eligible lessor, the developer, and one eligible lessee, the city.[3]

The inapplicability of the statutory exception seems to be obvious. In *Kansas City Star Company v. Shields,* 771 S.W.2d 101 (Mo.App.1989) the court upheld a finding of a purposeful violation of the statute where there was no statutory exemption applicable, and in *Charlier v. Corum,* 794 S.W.2d 676 (Mo.App.1990), the court upheld a finding of purposeful conduct even though the defendant had obtained legal advice that his office was not a public governmental body. *See also, Deaton v. Kidd,* 932 S.W.2d 804, 808 (Mo.App.1996) (a "good faith belief" does not negate liability for a purposeful violation). Even if the city council in this case had obtained legal advice to justify its conduct, it would be difficult not to find that its members acted purposely, because the statute is so clear: the section requires showing that public disclosure could adversely affect price, and I can find no evidence that "legal consideration" for the lease would be affected. However, the determination of whether defendants' conduct is purposeful is a question of fact that should be left to the trial judge upon remand, guided by the principles set forth here.

## Conclusion

For the foregoing reasons, I would reverse the trial court's conclusion that attorneys' fees cannot be awarded and would remand for the trial court to exercise its discretion to determine what attorneys' fees should be awarded to Spradlin because of defendants' violations of the open meetings law. I would also remand for the trial court to determine whether defendants' conduct was purposeful, and, if so, for consideration of civil fines under section 610.027.3.

---

3. Perhaps it may be contended that the price of the land to be paid by the developers would be affected by public disclosure of the project, but the exception does not exist to protect private business. Private parties who do deals with government, and seek public financing, should know that public business is done in the sunshine.