STATE of Missouri, MISSOURI DEPARTMENT OF SOCIAL SERVICES, DIVISION OF AGING, Respondent,

v.

CEDARS NURSING CENTER, INC., Respondent,

and

Healthcare Financial Partners Funding, Inc., Intervenor–Appellant.

No. WD 56439.

Missouri Court of Appeals, Western District.

Aug. 10, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 5, 1999.

Application for Transfer Denied Nov. 23, 1999.

Jon Edward Beetem, Jefferson City, for appellant.

Ronald Molteni, Jefferson City, Edward Cody, St. Louis, Harvey Tettlebaum, Jefferson City, for respondent.

PAUL M. SPINDEN, Judge.

When the Department of Social Services became aware that the licensed operator of Cedars Nursing Center, Inc., had not paid its payroll obligations for July 1998, it obtained an order from the circuit court placing Cedars in receivership. On July 31, 1998, the circuit court appointed Cedars Health Care Centre, Ltd., as receiver pursuant to the Omnibus Nursing Home Act, § 198.003 *et seq.*, RSMo 1994. The receiver desired to use Cedars' accounts receivable to pay the missed payroll, but Cedars had pledged its accounts receivable as collateral for a loan from HealthCare

Financial Partners Funding, Inc. (HCFP).[1] The receiver asked the circuit court to authorize its using the accounts receivable, including Medicaid and Medicare funds, to pay Cedars' employees.[2] The circuit court granted HCFP leave to intervene in the lawsuit. The circuit court sustained the receiver's motion and, pursuant to Rule 74.01(b), designated the order as a final judgment so HCFP could appeal the judgment immediately. We affirm the circuit court's judgment.

The issue in this case is whether the circuit court erred in authorizing the receiver to spend the accounts receivable for payroll and payroll related taxes before paying Cedars' secured creditors. In deciding this issue, we are mindful of the overriding purpose of the Omnibus Nursing Home Act:

> The Act before us is an exercise of the police power of the state, directed to the protection of the health, safety, and welfare of a large and increasing nursing home population. It regulates private institutions designed to shelter, feed and care for sick, aged and infirm persons, and bears a reasonable relation to the health, safety, and welfare of the community....
>
> ....
>
> The Act is addressed to the broad expanse of problems in the operation of nursing homes which have surfaced in substantial degree since the advent of

Medicaid in the mid–1960's and the mushrooming of the nursing home business. From the health and safety of nursing home residents, to their personal privacy and autonomy, to the protection of their funds and property, to the solvency of nursing home operators, to prevention of Medicaid fraud, the Act is a major legislative effort towards remedying indigenous areas of abuse in the operation of nursing homes.

*Stiffelman v. Abrams*, 655 S.W.2d 522, 528–29 (Mo. banc 1983).

■ Section 198.099, *et seq.*, governs nursing home receiverships. The General Assembly's intent in enacting the nursing home receivership statutes corresponds with the overriding purpose of the act to protect "the physical and mental well being of residents."[3] Steve Vosmeyer and Diane Felix, *The Missouri Omnibus Nursing Home Act of 1979: A Legislative History*, 24 St. Louis U.L.J. 617, 660 (1981). The General Assembly intentionally made the language authorizing receiverships to be broad "to protect the helpless." *Id.* at 649. Section 198.099 authorizes the appointment of a receiver when:

> (1) The operator is operating without a license;
>
> (2) The department has revoked the license of an operator or refused to grant an application for a license to the operator;

1. Cedars was an affiliate of Chartwell Healthcare, Inc. HCFP loaned $10 million to 35 Chartwell affiliates, including Cedars. As collateral for the loan, Cedars and the other Chartwell affiliates pledged their accounts receivable for services provided up to July 31, 1998, including any Medicare and Medicaid payments. HCFP perfected its security interest on February 19, 1998, before the receiver's appointment.

2. Cedars owed $87,403.30 for the July 1–18, 1998, pay period and $85,763.36 for the July 19–31, 1998, pay period.

3. HCFP asserts that "allowing the receiver to destroy HCFP's security interest in the accounts receivable of Cedars will detrimentally impact the well being of nursing home residents statewide by paralyzing financing of nursing home operations which critically depend upon accounts receivable financing to survive due to the delays inherent in the Medicare and Medicaid Reimbursement Programs." According to HCFP, "If such financing ceases, nursing home residents throughout Missouri will constantly face the threat of nursing home closings, failures and/or insolvencies." The effect of our decision may make those entities loaning money to nursing homes be more cautious in making their business decisions, but we do not agree that it will paralyze the financing of nursing home operations to the point of having a detrimental impact on nursing home residents' well being.

(3) The department has initiated revocation procedures and has determined that the lives, health, safety, or welfare of the residents cannot be adequately assured pending a full hearing on license revocation;

(4) The facility is closing or intends to close and adequate arrangements for relocation of residents have not been made at least thirty days prior to closure;

(5) An emergency exists in the facility;

(6) The operator is insolvent; or

(7) An owner of the land or structure is insolvent and such insolvency substantially affects the operation of the facility.

These problems, which if not corrected by a receiver as authorized by the General Assembly, have the potential of seriously jeopardizing the physical and mental well being of nursing home residents.

Section 198.112, RSMo 1994, grants a nursing home receiver 16 specific powers. Sections 198.112(8) and (9) authorize a receiver to "receive and expend in a reasonable manner the revenues of the facility due on the date of the order of appointment as receiver" and to "do all acts necessary or appropriate to conserve the property and promote the health, safety or care of the residents of the facility." The accounts receivable in this case existed on the date of the receiver's appointment; and payroll is a "reasonable" expenditure. Retention of qualified employees to care for the residents is "necessary" to "promote the health, safety or care of the resident[s]." Qualified employees rarely work without pay.

The General Assembly's mandate that the receiver honor certain security interests seemingly conflicts with this authority. Section 198.112(10) says that a receiver "[e]xcept as hereinafter specified in section 198.115,[4] shall honor all leases, mortgages, secured transactions or other wholly or partially executory contracts entered into by the facility's operator or administrator while acting in that capacity[.]" HCFP asserts that § 198.112(10) prohibited the receiver from spending Cedars' accounts receivable because HCFP had a prior, perfected security interest in them. We disagree.

Two competing interests confronted the receiver in this case. On one hand, the receiver was obligated to do what was necessary to take care of the facility's residents. On the other hand, the receiver was obligated to honor the facility's valid security interests. These obligations conflicted because the receiver had to pay the missed payroll to protect the facility's residents and the funds available to make such payroll were encumbered by a security interest.

A similar situation arose in *State of Missouri, ex rel. Ashcroft v. St. Louis No. 2, Inc.*, 618 S.W.2d 686 (Mo.App.1981). In that case, a nursing home operator desired to close the nursing home, so the circuit court appointed a receiver. The receiver's final accounting showed that it had paid the facility's employees' wages for the

---

**4.** Section 198.115.1, RSMo 1994, provides: "A receiver may not be required to honor any lease, mortgage, secured transaction or other wholly or partially executory contract entered into by the facility's operator or administrator while acting in that capacity, if the agreement is unconscionable." The circuit court found the "payment of accounts receivables to HCFA, a corporate secured lienholder, unconscionable[.]" The court said, "[I]t would clearly be an unconscionable result if this Court denied the Receiver's request to pay the payroll and related taxes. In that event, the employees will have received no economic benefit in exchange for their labor. HCFP, on the other hand, will receive the entire economic benefit of the unpaid employees' labor, i.e. the account receivable, undiminished by the direct cost of generating that receivable. In other words, HCFP will be better off as a result of its borrower's failure to make payroll than it would have been had the payroll been met. This is the kind of result § 198.115 was drafted to prevent." We disagree. Section 198.115.1 permits a receiver to dishonor a secured transaction if *"the agreement"* is unconscionable. Although employees' not being paid may be an unconscionable result, nothing about the agreement between Cedars and HCFP was unconscionable.

week before appointment of the receiver, but the secured creditor objected. This court's Eastern District upheld the circuit court's approval of the payment and found that the circuit court's determination that payment of wages was required "for the continued operation of the facilities" was supported by the evidence. *Id.* at 689. Further, the court held that the secured party did not carry its burden of showing that payment of the wages was deleterious to its security interest. *Id.*

The same is true in this case. Paying the payroll was necessary for the facility's continued operation and its residents' protection. HCFP did not offer any facts that established that paying the payroll was deleterious to its security interest. Its loan agreement with Cedars was a $10 million agreement with Cedars and 34 other Charter affiliates. HCFP had a security interest in the accounts receivable of all 35 Chartwell entities. The circuit court's ordering that the payroll ($173,166.66) be paid from Cedars' accounts receivable did not jeopardize HCFP's position as a secured creditor. HCFP had funds from 34 other Chartwell entities from which to seek payment.

HCFP dismisses as speculative the receiver's and department's claim that HCFP's security interest was not affected because other avenues existed for HCFP's pursuing relief. HCFP rebuffs the receiver's and the department's argument as attempting to dictate which remedy it must pursue to collect funds that were owed to it. HCFP does not recognize, however, its burden of showing that paying the payroll was deleterious to its security interest. *Id.* HCFP did not establish that no other funds were available to protect its security interest.

▆▆▆ HCFP also argues that § 198.132, RSMo 1994, sets forth the only procedure that the receiver could follow in obtaining reimbursements for the payroll expenses. Section 198.132.1 says: "Within thirty days after termination or such other time as the court may set, the receiver shall give the court a complete accounting of all property of which the receiver has taken possession, of all funds collected under section 198.108 and of the expenses of the receivership." Section 198.132.3 provides that, if the receivership's reasonable expenses exceed operating funds collected by the receiver, the receiver may apply to the court for such a determination: "If after notice to all interested parties and a hearing the court finds that in fact a deficiency does exist, then the court shall enter judgment in favor of the receiver and against the appropriate party or parties ... for the amount of such deficiency." Section 198.132.3. The court in this case did not ask for an accounting; hence, § 198.132 was not applicable. Moreover, § 198.112(1) says that a receiver "[m]ay exercise those powers and shall perform those duties as set out by the court[.]" Such statute gives the receiver the authority to seek an order from the court independent from the final accounting action.

▆▆▆ HCFP also argues that the payment of the missed payroll and payroll related taxes constitutes a taking in violation of Missouri's and the United States' constitutions. HCFP did not present this issue to the circuit court. "It is firmly established that a constitutional question must be presented at the earliest possible moment 'that good pleading and orderly procedure will admit under the circumstances of the given case, otherwise it will be waived.'" *Callier v. Director of Revenue*, 780 S.W.2d 639, 641 (Mo. banc 1989) (quoting *Meadowbrook Country Club v. Davis*, 384 S.W.2d 611, 612 (Mo.1964)). To raise a constitutional question, a party must "'(1) raise the constitutional question at the first available opportunity; (2) designate specifically the constitutional provision claimed to have been violated ...; (3) state the facts showing the violation; and (4) preserve the constitutional question throughout for appellate review.'" *Callier*, 780 S.W.2d at 641 (quoting *City of Eureka v. Litz*, 658 S.W.2d 519, 521 (Mo.App.1983)). In its sugges-

808

tions in opposition to the receiver's motion for authority to spend funds for payroll, HCFP mentioned that the receiver's actions constituted "a taking without compensation, a result prohibited by the United States Constitution." This was its only mention of the constitutional issue. HCFP presented no argument to the circuit court on this issue, and the circuit court's order did not address any constitutional issue. Hence, we conclude that HCFP waived its complaint.

We affirm the circuit court's judgment.

EDWIN H. SMITH, Presiding Judge, and FOREST W. HANNA, Judge, concur.