STATE of Missouri, MISSOURI DE-PARTMENT OF SOCIAL SERVICES, DIVISION OF AGING, Respondent,

v.

BROOKSIDE NURSING CENTER, INC., d/b/a Brookside Nursing Center, et al., Defendants,

HCFP Funding, Inc., Appellant,

and

Terry C. Allen, Respondent.

No. SC 83273.

Supreme Court of Missouri, En Banc.

June 26, 2001.

Jon E. Beetem, Jefferson City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Ronald S. Molteni, Asst. Atty. Gen., Terry C. Allen, Jefferson City, for Respondent.

PER CURIAM[1]

Healthcare Financial Partners Funding, Inc. (HCFP), executed a loan and security agreement with the defendants.[2] It later perfected a security interest in the defendants' receivables. Defendants were ordered into receivership, which lasted from August 4, 1998, to August 17, 1998. The receiver collected $ 177,891.39 of receivables for services rendered by the defendants before the receivership. The division of aging found successor operators for the defendants' facilities, who promptly paid the facilities' employees for work completed before the receivership.

On January 12, 1999, the receiver moved to reimburse the successor operators, out of the collected receivables, for the amounts that the successors paid. Invoking its perfected security interests, HCFP objected to the reimbursement. Nearly six months after the receivership terminated, on February 2, 1999, the circuit court found that enforcing HCFP's security interest would be unconscionable within the meaning of section 198.115.[3] The court authorized the receiver to reimburse the successor operators for advancing the missed payrolls. The remainder of the collected receivables would be paid to HCFP.

The trial court erroneously declared and applied the law as found in sections 198.112 and 198.115.1. The judgment is reversed, and the case is remanded.

## I.

■ It is undisputed that HCFP had a perfected security interest in the collected receivables. HCFP's right to the receivables was superior to that of any other parties in this case, *see* section 400.9–301, unless other statutes authorize the receiver to dishonor HCFP's security interest.

Section 198.112 prescribes the powers of a receiver in a nursing home receivership under section 198.099. Section 198.112(8) provides that the receiver "[s]hall receive and expend in a reasonable manner the revenues of the facility due on the date of the order of appointment as receiver, and to become due during the receivership." By section 198.112(9), the receiver "[s]hall do all acts necessary or appropriate to conserve the property and promote the health, safety or care of the residents of the facility." Section 198.112(10) provides:

> Except as hereinafter specified in section 198.115, [the receiver] shall honor all leases, mortgages, secured transactions or other wholly or partially executory contracts entered into by the facility's operator or administrator while acting in that capacity, but only to the extent of payments which become due or are for the use of the property during the period of the receivership.

Under section 198.115.1:

> A receiver may not be required to honor any lease, mortgage, secured transaction or other wholly or partially executory contract entered into by the facility's operator or administrator while acting in that capacity, if the agreement is unconscionable. Factors which shall

---

1. The Court of Appeals, Western District, originally decided this appeal in an opinion by the Honorable Edwin H. Smith. This Court then transferred the appeal. *Mo. Const. art. V, section 10.* Portions of the court of appeals opinion are incorporated without further attribution.

2. The defendants in the case are: Brookside Nursing Center, Inc.; Lincoln Manor Nursing Center, Inc.; Carrollton Nursing Center, Inc.; Glenwood Healthcare, Inc.; Silex Management Company, Inc.; and Fayette Nursing Center, Inc.

3. All statutory citations are to RSMo 1994.

be considered in determining the unconscionability include, but are not limited to, the following:

(1) The person seeking payment under the agreement was an affiliate of the operator or owner at the time the agreement was made;

(2) The rental, price, or rate of interest required to be paid under the agreement was substantially in excess of a reasonable rental, price or rate of interest at the time the agreement was entered into.

■ When construing statutes, this Court ascertains the intent of the legislature from the language used and gives effect to that intent. *Gott v. Director of Revenue,* 5 S.W.3d 155, 158 (Mo. banc 1999). The provisions of a legislative act are not read in isolation but construed together and read in harmony with the entire act. *Id.* at 159–60. The language of a statute is given its plain and ordinary meaning. *Spradlin v. City of Fulton,* 982 S.W.2d 255, 258 (Mo. banc 1998). Language is clear and unambiguous if plain and clear to one of ordinary intelligence. *Wolff Shoe Co. v. Dir. of Revenue,* 762 S.W.2d 29, 31 (Mo. banc 1988).

Reading the statutes together—and harmonizing them—the receiver shall receive and expend revenues in a reasonable manner. *Section 198.112(8).* It is reasonable to honor a secured transaction as provided in section 198.112(10).

The receiver shall do "all acts necessary or appropriate to conserve the property and promote the health, safety or care of the residents of the facility." *Section 198.112(9).* On the facts in this case, honoring HCFP's security interest as provided in section 198.112(10)—instead of reimbursing the successor operators—does not impair the property or the health, safety or care of the residents of the facility.

The court of appeals previously considered whether, under section 198.112, the receiver may dishonor HCFP's security interest in order to reimburse pre-receivership payrolls. *State v. Colonial Healthcare Ctr., Inc.,* 3 S.W.3d 798, 800 (Mo.App. 1999); *State v. Cedars Nursing Ctr., Inc.,* 3 S.W.3d 803, 805 (Mo.App.1999). The court found no ambiguity in subdivisions 8 and 9 of section 198.112. However, the court held that section 198.112(10)—requiring the receiver to honor security interests-seemingly conflicted with subdivisions 8 and 9.

> Two competing interests confronted the receiver in this case. On one hand, the receiver was obligated to do what was necessary to take care of the facility's residents. On the other hand, the receiver was obligated to honor the facility's valid security interests. These obligations conflicted because the receiver had to pay the missed payroll to protect the facility's residents and the funds available to make such payroll were encumbered by a security interest.

*Colonial,* 3 S.W.3d at 801–02; *Cedars,* 3 S.W.3d at 806.

The *Colonial* and *Cedars* cases incorrectly hold that the subdivisions of section 198.112 conflict. When subdivisions 8, 9 and 10 are read in harmony with section 198.115, no conflict exists. To the extent the rationale of *Colonial* and *Cedars* is to the contrary, it is overruled.

■ Absent express definition, statutory language is given its plain and ordinary meaning, as typically found in the dictionary. *Am. Healthcare Mgmt., Inc. v. Dir. of Revenue,* 984 S.W.2d 496, 498 (Mo. banc 1999) (citation omitted). The dictionary defines "unconscionable" as "1 Not conscionable; unreasonable.... 2 Not guided or controlled by conscience; unscrupulous.... 3 Outrageous; egregious." *Web-*

ster's *Third New International Dictionary* 2763 (3d ed.1976).

A court also may consider other legislative or judicial meanings of a term. *See Citizens Elec. Corp. v. Dir. of Revenue,* 766 S.W.2d 450, 452 (Mo. banc 1989). "Unconscionable"—in section 153 of the *Restatement (Second) of Contracts*—is "an inequality so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." *Peirick v. Peirick,* 641 S.W.2d 195, 197 (Mo. App.1982); *Schlottach v. Schlottach,* 873 S.W.2d 928, 932 (Mo.App.1994)(separation agreements in dissolution cases). In the UCC, an agreement or contract is "substantively unconscionable if there is undue harshness in the terms of the contract." *World Enters., Inc. v. Midcoast Aviation Servs., Inc.,* 713 S.W.2d 606, 611 (Mo.App. 1986).

A term in a statute must be considered in context. *Weiss v. Rojanasathit,* 975 S.W.2d 113, 117 (Mo. banc 1998). Here, by making the mandate of section 198.112(10)—requiring the receiver to honor secured transactions—subject to the exception in section 198.115.1, the legislature intended to protect the rights of secured parties.

In normal circumstances, the statutory scheme requires a receiver to honor security agreements unless they are found to be unconscionable under section 198.115.1. Although section 198.115.1 does not define "unconscionable," it states two factors to be considered in determining unconscionability:

(1) The person seeking payment under the agreement was an affiliate of the operator or owner at the time the agreement was made;

(2) The rental, price, or rate of interest required to be paid under the agreement

was substantially in excess of a reasonable rental, price or rate of interest at the time the agreement was entered into.

*Section 198.115.1(1), (2).* Both these factors emphasize the time that the agreement was "made" or "entered into." They reflect a concern that the agreement should not be "unconscionably" advantageous to the person enforcing a security interest. Both factors also focus on the parties to the agreement. Although section 198.115.1 states that the listed factors are not exclusive, these factors illustrate the scope of the statute. *Schudy v. Cooper,* 824 S.W.2d 899, 901 (Mo. banc 1992). These factors are not present in this case.

The receiver contends that the statutory mandate to do "all acts necessary . . . to . . . promote the health, safety or care of the residents" is a factor in determining unconscionability. *See section 198.112.* According to the receiver, HCFP's security agreements are unconscionable and subject to dishonor because the facilities' employees would not continue work without being paid, causing the facilities to close, thereby uprooting of the residents and adversely affecting their health, safety and care. This scenario did not exist here. The receiver did not request to spend collected receivables to pay the missed payrolls. The receiver requested only to reimburse the successor operators for advancements made to meet payrolls.

In a different case, a court may reasonably authorize a receiver to dishonor a security interest if necessary for the continued operation of the facilities. In this case, there are no such facts.

## II.

The receiver alternatively argues that the trial court properly authorized reimbursement because HCFP did not "carry its burden of showing that payment

of the wages was deleterious to its security interest," citing *Colonial, Cedars,* and *State ex rel. Ashcroft v. St. Louis No. 2, Inc.,* 618 S.W.2d 686, 689 (Mo.App.1981). The court in *Ashcroft* stated:

> Appellants also complain that the payment of wage claims is inimical to their security interest. The record does refer to some security interest of appellant American Geriatric Enterprises, Inc. in Fairgrounds Manor and Hamilton Medical Center. And it is true that a receiver acquires possession of the assets subject to liens and equities affecting the property. *Edmiston v. J.C. G.—Medallion, Inc.,* 570 S.W.2d 306, 310 (Mo.App. 1978). But the record is destitute of any evidence as to the type of security held by American Geriatric or how the receiver's payment of the payroll promised to have been paid by appellants is deleterious to that security interest—a burden for appellants to carry. Thus, appellants' arguments aimed at protection for their security—whatever it may be—are not here pertinent.

*Id.* at 688–89. This opinion cites no authority that the secured party must show that payment is "deleterious" to its security interest. Section 400.9–203 does not require that the secured party, enforcing its security interest, show that the challenged payment is "deleterious" to—as opposed to violating—its security agreement and interest. To the extent *Ashcroft, Colonial* and *Cedars* hold to the contrary, they are overruled.

### III.

The circuit court erred in authorizing the receiver to dishonor HCFP's perfected security interest and to expend the collected receivables to reimburse successor operators for monies advanced to pay defendants' employees. In doing so, it erroneously declared and applied the law as found in sections 198.112(10) and 198.115.1. HCFP is entitled to all receivables encompassed by its perfected security interest.

The judgment is reversed, and the case is remanded.

PRICE, C.J., LIMBAUGH, WHITE, HOLSTEIN and BENTON, JJ., concur; WOLFF, J., concurs in part and dissents in part in separate opinion filed; RAHMEYER, Sp. J., concurs in opinion of WOLFF, J.

LAURA DENVIR STITH, J., not participating.

WOLFF, Judge, concurring in part and dissenting in part.

I agree with the analysis of the principal opinion, but come to a different result. Chapter 198 RSMo gives priority, in every sense, to the health and safety of the nursing home residents. Consistent with Chapter 198, this Court should affirm the trial court's order reimbursing the amount of wages that the subsequent operator paid to the nursing home employees.

The statute and the trial judge's order appointing the receiver give the receiver broad powers to provide for the health and safety of the residents in just this kind of situation. The receivership was ordered when the nursing home operators failed to pay their employees. According to the division of aging, the failure to meet payroll created a "substantial risk that there will not be sufficient trained staff" to care for the residents. The situation, according to the judge's order, was an emergency, and no one disputes this.

The trial court appointed the receiver on August 4, 1998, and gave him broad powers to receive and expend the funds of the facility for the benefit of the residents. As I read the principal opinion, the receiver could have used the receivables, as they

were paid to him, to pay the staff wages, even though the wages had been earned and were payable before the receivership. This certainly would have been within the receiver's statutory power, cited by the principal opinion, to do "all acts necessary or appropriate to conserve the property and promote the health, safety or care of the residents of the facility." Section 198.112(9).

Under the statute, as interpreted by the principal opinion, the receiver probably could have gone to a bank and borrowed money to pay the wages of the residents' caregivers. That would have passed the test of reasonableness, and payments to the bank would presumably have trumped the security interests in receivables protected by section 198.112(10).[1]

Instead, the receiver—or the state division of aging—arranged for a nursing home operator, N & R of Sweet Springs, Inc., to take charge of the facilities. Section 198.112(2)(b).[2] N & R paid the back wages and kept the facilities operating for their residents. Because N & R was ready, willing and able to care for the residents, the trial court terminated the receivership effective August 15, 1998—a period of less than two weeks.

The receiver requested that the trial court pay N & R the amounts paid for back wages from the Medicaid reimbursements that were part of the receivables. The request was made in January 1999, months after the receivership had been terminated. At that point, N & R was providing care, and there was no emergency.

The majority seems to imply that it is improper for N & R, appointed by the receiver, to pay the unpaid payroll and then get reimbursed. But the majority seems to ignore the fact that the receiver expected N & R to operate the home during the receivership, which included paying the employees so they would stay and care for the residents.

The crucial fact for the principal opinion simply is timing. If the receiver had paid the wages during the receivership in August 1998, that clearly would have been a reasonable expenditure to head off or to end an emergency affecting the health or safety of the residents. If the receiver had gone to a bank, presumably the same result would have been reached. But here the receiver went to the subsequent operator, which advanced the funds in order to pay and to keep the employees. Thus the emergency was abated by the money advanced by N & R.

According to the principal opinion, now it is "reasonable" to honor the security interest that Healthcare Financial Partners Funding, Inc., held before the receivership. The only exception, now that the emergency is abated, is based on unconscionability, as that term is used in section 198.115.1.[3] While unconscionability usual-

---

1. Section 198.112(10) provides:
   Except as hereinafter specified in section 198.115, [the receiver] shall honor all leases, mortgages, secured transactions or other wholly or partially executory contracts entered into by the facility's operator or administrator while acting in that capacity, but only to the extent of payments which become due or are for the use of the property during the period of the receivership;

2. Section 198.112(2) provides that the receiver:

(2) May, in his discretion, either:
(a) Assume the role of administrator or manager and take control of all day-to-day operations; or
(b) Name an administrator or manager to conduct the day-to-day operations of the facility subject to the supervision and direction of the receiver;

3. Section 198.115.1 states in part:

   1. A receiver may not be required to honor any lease, mortgage, secured transaction

ly is viewed at the time of formation of an agreement, in cases such as this it can only be determined after the fact. *Miles v. Werle,* 977 S.W.2d 297, 304 (Mo.App.1998); *Darr v. Darr,* 950 S.W.2d 867, 872 (Mo. App.1997). As between the creditor with a security interest in receivables and a creditor-operator that advanced funds to keep the homes in operation for the benefit of the residents, a decision favoring the former is unconscionable.

Under the result reached by the principal opinion, the nursing home residents must be held as hostages in order to get the staff its pay. If the receiver makes the staff wait until the Medicaid or other reimbursements arrive, some staff—especially those paid barely above minimum wage—may quit. This in turn would frustrate the purposes of the act because it is necessary to retain qualified staff in order to promote the residents' health, care, or safety. So it is puzzling as to why the receiver cannot engage an operator to manage the facilities during the receivership, pay the employees and avert a crisis—and, then, to expect repayment from the incoming receivables.[4] For what are accounts receivable? Nothing more than a balance sheet term used to identify the money owed to a business for services rendered or goods sold. Businesses pay their expenses, including payroll, from these funds. An interest in accounts receivable does not supersede the interests of wage-earners whose pay is necessary to keep the business going.

If the receiver cannot obligate the incoming receivables to repay this loan to cover employees' back wages, it is difficult to see how a receiver in the future is going to be able to make this kind of arrangement with an interim manager or a new operator. It seems obvious that the receiver not only expects, as here with N & R, but also requires the manager or successor-operator he hires to manage the home throughout the receivership. Such management may include advancing payrolls so employees will continue to work, and the residents will continue to be cared for and protected.

However, based on language of the principal opinion, the receiver will have to keep the facility in crisis—and hold open the receivership—in order to get priority as to the funds to keep the facility operating for the benefit of the residents. This runs contrary to the policy of the act. Steve Vossmeyer & Diane Felix, *The Missouri Omnibus Nursing Home Act of 1979: A Legislative History,* 24 St. Louis U. L.J. 617, 649 (1981). By continuing to keep the facility in receivership and, thus, in perceived crisis, the residents will run the risk of being in danger, as employees may decide to leave the sinking ship.

The majority apparently finds significance in the distinction between the receiver requesting funds to pay for missed payrolls verses reimbursing a subsequent

---

or other wholly or partially executory contract entered into by the facility's operator or administrator while acting in that capacity, if the agreement is unconscionable. Factors which shall be considered in determining the unconscionability include, but are not limited to, the following:
(1) The person seeking payment under the agreement was an affiliate of the operator or owner at the time the agreement was made;

(2) The rental, price, or rate of interest required to be paid. under the agreement was substantially in excess of a reasonable rental, price or rate of interest at the time the agreement was entered into.

4. Such expenditures should be deemed to come within the purview of the receiver's duties as they are both "reasonable" and necessary "to conserve the property and promote the health, safety or care of the residents of the facility." Section 198.112(8) and (9).

operator for advances it has made to pay for wages that were due. It does give guidance on how to accomplish getting priority for such funds in the future by keeping the receivership open, but I find it impossible to discern a principled difference between paying the employees in August 1998 and reimbursing the operator in February 1999 for having paid them. The emergency was, thankfully, short-lived because of the subsequent operator's funds. But is this the thanks the subsequent operator gets for abating the emergency?

On the result reached by the principal opinion, I respectfully dissent.