STATE of Missouri, Respondent,

v.

Curtis McCLUNIE, Appellant.

No. 53746.

Supreme Court of Missouri,

Division No. 2.

March 10, 1969.

Norman H. Anderson, Atty. Gen., Jefferson City, Robert H. Jones, Sp. Asst. Atty. Gen., Kennett, for respondent.

J. Arnot Hill, The Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant.

DONNELLY, Judge.

Appellant, Curtis McClunie, and four other men were charged by indictment with the commission of the detestable and abom-

inable crime against nature under § 563.230, RSMo 1959, V.A.M.S. Appellant and three other men were jointly tried, and were convicted by a jury in the Circuit Court of Jackson County, Missouri. Appellant's punishment was assessed at imprisonment in the custody of the Missouri Department of Corrections for a period of two years. Following rendition of judgment and imposition of sentence, an appeal was perfected to this Court.

Appellant contends the trial court erred in overruling his motion for a directed verdict of acquittal at the close of the evidence because the evidence is not sufficient to sustain the conviction.

 This contention was not assigned as error in appellant's motion for new trial, and, therefore, the issue is not properly preserved for appellate review. State v. Nolan, Mo.Sup., 423 S.W.2d 815. However, if the evidence is not sufficient to sustain the conviction, plain error affecting a substantial right is involved from which manifest injustice must have resulted. S.Ct. Rule 27.20(c), V.A.M.R. Therefore, we will consider appellant's contention.

Appellant concedes that a conviction may be had in a sodomy case upon the uncorroborated evidence of the victim, but asserts that "when the evidence of such * * * [victim] is of a contradictory nature, or when applied to the admitted facts in the case * * * [his] testimony is not convincing but leaves the mind of the court clouded with doubts, * * * [he] must be corroborated, or the judgment cannot be sustained." State v. Tevis, 234 Mo. 276, 284, 136 S.W. 339, 341.

According to testimony elicited from Joe Louis Murphy, he was confined in "E" Tank of the Jackson County jail on October 11, 1967. At or about 8:00 o'clock that evening, as he was watching television in the bullpen, appellant, and four other men, "took a towel and put it around my mouth, drug me out of the bull pen, and

were forming a headlock around my neck, put me in 2 Cell."

Murphy testified positively, and with particularity, as to the commission of the acts of sodomy upon him in Number 2 Cell, the details of which need not be recited. He identified appellant, and his co-defendants, at the trial, as four of the men who forced him into Number 2 Cell. He testified that he was "able to see each and every one" of them as they committed the acts of sodomy upon him. He testified without contradiction that the acts were committed upon him against his will.

We have reviewed the testimony of Joe Louis Murphy, and find nothing of a contradictory nature. The question then becomes whether his testimony "is not convincing but leaves the mind of the court clouded with doubts."

Appellant first asserts that Murphy's testimony is not convincing because, although law enforcement officials were near the scene, Murphy failed to enlist "their assistance in thwarting his assailants."

Murphy testified on direct examination as follows:

"Q And did they make any threats to you?
A Yes, sir.

Q What did they tell you?

A They threatened to stab me if I told.

Q Did you believe them? A No, sir.

Q And did they stay close to you that evening or what happened after they all finished?

A They stayed pretty close that morning, at breakfast.

Q And did they keep making threats to you? A Yes, sir.

Q What did they threaten to do? A I can't remember them all.

Q Well, some of them, whatever you remember.

A They said they'd get me in the penitentiary or some way over there.

Q They'd get you in the penitentiary? A Yes; or on the streets.

Q On the streets? A Yes.

Q If you told about it? A Yes.

Q And did you subsequently tell anybody about this?

A Yes; I told the guard as I was coming up from court.

Q Now, you stated you went to breakfast and these five men stayed close to you and were making threats. A Yes.

Q Now, when were you able to get away from these five men?

A When I went to court the following morning.

Q And you told the deputy about it? A Yes.

Q And after you told the deputy, what happened?

A The deputy told Mr. Brice.

Q And what occurred then? A I told Mr. Brice what happened.

Q And did he have you identify the five persons that committed this crime against you? A Yes, sir.

Q And are four of those five seated here in the courtroom today and defendants in this case? A Yes, sir."

Murphy testified on cross-examination as follows:

"Q You were in Number 1 cell. What cell did you stay in that night? A 1 cell.

Q Now, what happens—well, maybe you can tell me, do they lock each eight-man cell up every night? A Yes.

\* \* \* \* \* \*

Q What time do they close this—A (Interrupting) I think 11 o'clock.

Q Eleven o'clock. What did you do from the time of 8:30 to 11 o'clock? A What did I do?

Q Yes. A I was trying to get out of my cell, I couldn't leave my cell or kick on the wall for the guard, I couldn't.

"THE COURT: A little louder, please.

Q (By Mr. Krebbs) You did what?

A I said I tried to get out of my cell after they ordered me to go into my cell and I tried to get out into the bull pen to kick on the wall for the guard.

\* \* \* \* \* \*

Q Who was in Number 1 cell after 11 o'clock when they locked all the eight-man cells up, who was in your cell?

A All the guys that slept in 1 cell.

Q Were any of the defendants in your cell that night? A No.

Q Therefore you were not threatened all night long, were you?

A No.

Q When you came back from court it was at that time you told the guard what had happened the night before? A Yes."

We do not agree that Murphy's testimony is rendered unconvincing because he failed to enlist the aid of law enforcement officials. He explained why he was unable to enlist their aid until the morning after the incident. Appellant's point is without merit.

Appellant next contends that Murphy's testimony is not convincing because there was not sufficient light in Number 2 cell to enable Murphy to identify appellant as one of his assailants.

Murphy testified on cross-examination as follows:

"Q How many lights were on in the bull pen at this time?

A Just outside light.

Q What is the outside light? A Rail.

## 270

Q What do you mean, the rail light?

A Where the guard and trustee [sic] walks.

Q It's not in the bull pen, is it? A No.

Q Is this an open area with just bars? A Yes.

\* \* \* \* \* \*

Q \* \* \* How many lights are out there in this area? A Three.

Q What type of lights are they? Are they lights like up here?

A Yes, but they're long.

Q They're long? A Yes.

Q Thin lights? A (Nods affirmatively.)

Q Now, were all three of these lights on?

Q Just the one out front.

Q There was only one light on at that time, there's three lights but only one was on, is this correct? A Yes.

\* \* \* \* \* \*

Q Were there any lights on in the bull pen? A No.

Q Do they have lights in the bull pen? A Yes.

\* \* \* \* \* \*

Q Now, was there a light on in this—A (Interrupting) No.

Q No light on in that cell? A No.

\* \* \* \* \* \*

Q And you were able to see when they threw you down on the bed, or the bunk, in the cell number 2, you were able to see each one of them? A Yes.

Q Because of the light which came from —you can't estimate how far away, you said a little bit of light came through, is this correct? A Yes."

Deputy Sheriff Brice testified as follows:

"Q Would you tell the Court and jury what the lighting is in that area at 8 o'clock in the evening before the cells are locked?

A At that time of the night there is lights on the—what we call the side rail, there is lights there. And then there is lights out in front and there's five windows, about that big square (indicating), that throws lights into the bull pen. It's never dark, what you call pitch dark, up there at any time.

Q And at 8:30 in the evening would there be sufficient light in Number 2 cell to identify features? A I think so, yes.

Q Would there be sufficient light in the bull pen to identify features? A If the lights was on in the bull pen, yes.

Q And this light that you state, rail light, or along the rail, that would illuminate into Number 2 cell, would it not, sir?

A Into the bull pen and Number 2 cell, yes.

Q And in addition to that I think you stated there were five windows that would also allow light into Number 2 cell? A Yes."

■ We believe there was substantial evidence adduced to support a finding that Murphy could see his assailants and, as a result, identify them. We do not consider Murphy's testimony unconvincing in this regard. Appellant's point is without merit.

■ Appellant finally contends that Murphy's testimony is not convincing because he was afforded an opportunity to obtain medical corroboration and refused. The record shows that Murphy did not seek medical attention. However, we do not believe this renders his testimony unconvincing. "Not all victims of perversive sexual acts would be willing to expose themselves to the humiliation of physical inspection; rather might some prefer to remain silent." State v. Wilson, Mo.Sup., 233 S.W. 2d 686, 688. The point is without merit.

It is our opinion that application of the rule set forth from State v. Tevis, supra, does not assist appellant. The credibility of Murphy's testimony was for the jury. The evidence was sufficient to make a case for the jury and appellant's motion for directed verdict of acquittal was properly overruled.

An examination of the record as required by Rule 28.02, V.A.M.R., discloses no error. The judgment is affirmed.

All of the Judges concur.