**STATE of Missouri,**
**Plaintiff–Respondent,**

v.

**Julio Galaviz LUNA,**
**Defendant–Appellant.**

**No. WD 40608.**

Missouri Court of Appeals, Western District.

Oct. 16, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 4, 1990.

Application to Transfer Denied Jan. 9, 1991.

Susan L. Hogan, Ellen H. Flottman, Columbia, for defendant-appellant.

William L. Webster, Atty. Gen., Stewart M. Freilich, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before NUGENT, C.J., WASSERSTROM, Senior Judge, and FENNER, J.

NUGENT, Chief Judge.

Defendant Julio Galaviz Luna appeals his conviction for the murder in the second degree of Ipolito Castillo. We reverse the judgment of the trial court.

Defendant Luna raises five points on appeal, including his claim that insufficient evidence supported the jury's verdict. Since we agree with his claim of insufficiency, we need not address the remaining points, including his claim under Rule 29.-15 [1] of ineffective assistance of counsel.

The evidence most favorable to the prosecution shows the following:

Early on the morning of August 23, 1987, a Sunday, defendant Luna, Obed Martinez, and Ipolito Castillo, all migrant farm workers, awoke in the small farmhouse that they shared outside Smithville. Franz and Annelise Leuthardt, owners of the farm, lived nearby in the main house. Next to the workers' house stood the trailer-home of the Leuthardts' foreman, James Till, and his family. Mr. Martinez, while preparing breakfast, heard his housemates arguing briefly over the recording of a cassette tape. At trial, he referred to the argument as a "fight," saying, "Well I was in the kitchen, and they was raising their voices and it didn't last too long."

Mr. Martinez abandoned his cooking, and the men drank a breakfast consisting of vegetable juice, raw eggs and two cans of beer each. The other two men told Mr. Martinez that neither of them planned to work that day nor to go with him to Smithville. About seven o'clock, he rode with

---

1. Missouri Rules of Criminal Procedure, 1990.

Mr. Leuthardt and Mr. Till to Smithville, where the two men dropped him off and continued on to Kansas City.

The state concedes that at approximately ten o'clock, defendant Luna, holding a letter with a telephone number on it, knocked at the Till's door and gestured to the family's seven year old boy that he wanted to use the telephone. The boy explained that his mother had not yet risen and he could not allow the defendant to use the phone. At trial, he testified that the defendant "was sorta shivering."

The defendant then went to the Leuthardt's house and explained to Mrs. Leuthardt, who spoke some Spanish, that he wished to use her telephone.[2] Fearing that alone she could not prevent her dog from attacking him if he entered, she asked him to come back after her husband had returned. Mrs. Leuthardt testified that defendant Luna spoke more than he usually did, and more rapidly. She further testified, however, that she could not remember previously having directly spoken with him.

The defendant then began walking along the public road toward Smithville. Sometime before ten-thirty, James Noland, a neighbor driving to the town, offered him a ride. They rode together to the town library's telephone booth, where the defendant got out.

Meanwhile, Neil Ellington, a local farm manager, drove behind Mr. Noland's truck. He testified that ten to fifteen minutes after the defendant entered Mr. Noland's truck, he passed Obed Martinez, partially prostrate beside the road, retrieving beer cans. At about ten forty-five, driving in the opposite direction, he again passed Mr. Martinez walking toward the Leuthardt farm.

Mr. Martinez testified that a little before eleven o'clock he returned to the workers' house and found the body of Ipolito Castillo, a knife protruding from his chest, a white shoelace looped round his neck.[3] He immediately reported the stabbing to the

Tills, who telephoned the Leuthardts, who telephoned the authorities. The police arrived ten minutes later and issued a pickup order for the defendant. At trial, evidence established the time of death as between ten and eleven o'clock.

Defendant Luna testified that while in Smithville, he tried to call Mexico from the library's telephone booth but failed because he could not communicate with the local operator. He made purchases in a doughnut shop and an auto parts shop. He went to a bar, found it closed, and bought a bottle of whiskey from someone in a car parked nearby. After purchasing eye drops at a grocery store, the defendant walked toward the end of the block to drink his whiskey.

A patrolman approached, and without protest the defendant returned with him to the Leuthardt farm. Upon his arrival, he found police, the Leuthardts and their son, the Tills and Mrs. Till's brother, and Obed Martinez. The police tried to question the defendant but failed because of the language barrier. At the Platte County Sheriff's Office a Kansas City police officer explained his *Miranda* rights to the defendant in Spanish and translated as the Platte County officers questioned him.

At the time of his arrest, defendant Luna had several bruises on the upper parts of his legs and "scrape-type cuts" on his left arm. Laboratory tests determined that two drops of Type–O blood found on his jeans matched the victim's and Obed Martinez' blood type, but not the defendant's. The evidence showed that about seven persons per thousand have that type of blood. The defendant testified that the jeans came from a box of clothes shared by all the workers, but Mr. Martinez testified that the box of clothes belonged to Mr. Luna. The state introduced two photographs of Ipolito Castillo's body as the police found it on their arrival. One photograph showed his bloodied body lying with the knife pro-

2. According to Mrs. Leuthardt, the defendant arrived at a little after ten o'clock that morning. Mr. Luna told the police, however, that he arrived at about seven-thirty or eight o'clock.

3. At trial, Mr. Martinez testified that early in August the defendant had offered but had not shown him laces for his workboots.

truding from his chest and the shoelace loosely round his neck. A pathologist testified that Mr. Castillo died between ten and eleven o'clock in the morning and that abrasions found on his lower back could have resulted from rubbing against the defendant's belt buckle. The state did not show that the buckle had any of the decedent's blood or skin on it.

A jury found the defendant guilty. The court denied the defendant's motions for a new trial or for a judgment of acquittal and sentenced the defendant to fifteen years' imprisonment.

■ The defendant argues that the trial court erred in denying his motions for acquittal at the close of the state's evidence and again at the close of all the evidence, and in sentencing him on his conviction, since the state presented insufficient evidence to sustain the jury's finding of guilt beyond a reasonable doubt. He argues that the evidence failed to prove that he rather than another person had killed Mr. Castillo.

■ To prove second degree murder the state must show that the accused knowingly caused the death of another person. The state produced the following evidence: (1) the defendant and Mr. Castillo argued briefly the morning of the murder; (2) the beginning of the period of the estimated time of death fell close to the time that the defendant sought to use the Tills' or the Leuthardts' telephones; (3) the defendant shivered and spoke more rapidly than usual when he asked to use the telephones; (4) the defendant had offered new shoelaces to Obed Martinez two weeks before the murder; (5) the defendant's jeans bore two drops of blood matching both Obed Martinez' and the victim's but not the defendant's blood group, and Obed Martinez testified that only the defendant had worn those jeans; (6) the defendant's legs and left arm bore bruises and scrapes; (7) evidence established that the defendant's belt buckle could have caused the abrasions found on Mr. Castillo's back.

4. We do not denominate Missouri Supreme Court cases decided after October 28, 1982, as "en banc" decisions, because since that date the

■ In addressing a challenge to the sufficiency of evidence, an appellate court must view as true the evidence of the prevailing party and all reasonable inferences drawn from it and ignore all contrary evidence and inferences. *State v. Mallett,* 732 S.W.2d 527, 530 (Mo.), *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987).[4] *See also Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The court employs this standard in reviewing all evidence, direct as well as circumstantial. *State v. Williams,* 652 S.W.2d 102, 111 (Mo.1983). We must determine whether the state adduced evidence sufficient to justify its submission to the jury. *State v. Ramsey,* 368 S.W.2d 413, 418 (Mo.1963); *State v. Roby,* 756 S.W.2d 629, 629 (Mo.App.1988).

■ When, as here, the state has introduced only circumstantial evidence, the test for determining whether it introduced evidence sufficient to allow submission of the case to a jury requires neither conclusive proof of guilt nor proof of the impossibility of innocence. *State v. Wahby,* 775 S.W.2d 147, 154–55 (Mo.1989); *State v. Easley,* 662 S.W.2d 248, 250 (Mo.1983); *State v. Franco,* 544 S.W.2d 533, 534 (Mo.1976) (en banc). Rather, the three-pronged test requires that proffered circumstances and facts coincide with each other, comport with a hypothesis of guilt, and exclude every reasonable hypothesis of innocence. *State v. Wahby, supra,* at 154–55; *State v. Easley, supra,* at 250; *State v. Franco, supra; State v. Newbold,* 731 S.W.2d 373, 380 (Mo. App.1987); *State v. Richardson,* 719 S.W.2d 884, 886 (Mo.App.1986). Far from conclusively proving Mr. Luna's guilt, the state here failed to demonstrate even a reasonable hypothesis of guilt.

■ We find utterly ambiguous, for example, three of the state's circumstantial links between Mr. Luna and Mr. Castillo's murder. First, testimony regarding the defendant's demeanor when he asked to use telephones has little probative value. Mrs.

court has decided all its cases en banc. We denominate as "en banc" cases decided by the court en banc before that date.

Leuthardt testified that she could not remember ever before having spoken directly with the defendant. She did not testify that she had ever observed his usual manner of speech, whether in English or Spanish, or his usual demeanor. Thus, so far as the evidence shows, she could not know that Mr. Luna in fact spoke or acted in any way different from his customary manner because she had no experience upon which to base such a judgment. To paraphrase Wigmore, so far as the evidence shows, she lacked the opportunity for observation. *See* 2 WIGMORE, EVIDENCE, §§ 650, 661 (Chadbourn rev. 1979), and the trial court could have refused to allow her testimony on the ground of incompetency as a witness because only a witness who knows certain facts may testify to those facts. *State v. Dixon*, 420 S.W.2d 267, 271 (Mo. 1967); *Cummings v. Tepsco Tenn. Pipe & Supply*, 632 S.W.2d 498, 500 (Mo.App. 1982). Further, her testimony that the defendant seemed excited fails the accepted test of relevancy, *see McCormick on Evidence*, 3rd ed. (1984), at 541–43, because it had no probative value; her observations constituted little more than speculation on Mr. Luna's demeanor. Relevant evidence must make a fact more probable than the fact would appear without that evidence. *See Mutual Life Ins. v. Hillmon*, 145 U.S. 285, 296, 12 S.Ct. 909, 913, 36 L.Ed. 706 (1892); *McCormick, supra*, at 541–43. Nor does the evidence show that seven-year-old Jimmy Till had any familiarity with the defendant's personality or speech habits.

Further, the bruises and scrapes observed on the legs and arm of a farm laborer lead nowhere except to speculation. Likewise, the abrasions on Mr. Castillo's lower back allow for only speculation as to their source. He too did heavy field work. Defendant's belt buckle conceivably could have caused such abrasions, but "could have" does not suffice. In addition, nothing on the buckle linked it to the abrasions. A court may never accept ambiguous evidence such as this as substantial evidence.

The substantiality of the state's three strongest circumstantial links between Mr. Luna and the murder rely in whole or in part on Mr. Martinez' uncorroborated testimony. First, The argument between defendant Luna and victim Castillo conceivably bears upon but establishes next to nothing concerning a motive for murder. Obed Martinez testified that the "fight" consisted only of raised voices and lasted but a short time. That evidence appears far too insubstantial to lead a reasonable person to the necessary conclusion that it grew into anger violent enough to cause the defendant to commit murder. Further, nothing in the record shows that the defendant had ever demonstrated a violent temperament.

Likewise, a reasonable person could find little probative value in the defendant's offer of new shoelaces to Obed Martinez. Nothing links the unseen offered shoelaces to the white shoelace looped round the victim's neck. The source of the white shoelace remains a mystery. We find this evidence little better than speculative in value, and we question its conclusiveness and substantiality particularly since it rests entirely on the testimony of Mr. Martinez.

The blood on the defendant's jeans matching the victim's blood type provides the only substantial circumstantial link between the defendant and the victim's death. Nevertheless, this link remains tenuous because the inference that the blood came from the victim rests mainly on Mr. Martinez' testimony that only Mr. Luna had worn those pants. The relatively rare blood type found on the jeans matched Mr. Martinez' blood type, but he testified that he could not remember bleeding onto the pants. We find this link too insubstantial to send a case of murder to a jury.

In addition, although we may not weigh the evidence, we note in passing that several other adults beside Mr. Luna occupied the farm between ten and eleven o'clock the morning of the murder, including the Tills and Mrs. Till's brother, and the Leuthardts and their son. Further, Obed Martinez returned to the farm during that hour. Under the state's theory that the murder occurred between ten and eleven o'clock in the morning, both Mr. Luna and Mr. Martinez remained in the vicinity of the victim's body for equal periods of time

during that hour: the record demonstrates that Mr. Luna left the farm no later than five or ten minutes after ten and that Mr. Martinez returned to the farm at about ten fifty or ten fifty-five.

 The Constitution demands that in all criminal cases the prosecution present evidence sufficient to prove beyond a reasonable doubt all elements of a criminal charge. *Jackson v. Virginia, supra,* 443 U.S. at 309, 313–14, 99 S.Ct. at 2783, 2785–86; *In re Winship,* 397 U.S. 358, 363–64, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970); *State v. Priest,* 660 S.W.2d 300, 305–06 (Mo.App.1983). In *Jackson v. Virginia, supra,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89, the Court held that in reviewing the sufficiency of the evidence an appellate court need not believe that the trial evidence established guilt beyond a reasonable doubt; rather, it must determine whether *"any* rational trier of the facts could have found the elements of the crime beyond a reasonable doubt." The "reasonable doubt" requirement "provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" *In re Winship, supra,* 397 U.S. at 363, 90 S.Ct. at 1072.

 Even the cumulated state's evidence, failed to satisfy "an essential of the due process guaranteed by the Fourteenth Amendment ...," namely, "that no person shall be made to suffer the onus of criminal conviction except upon" proof "beyond a reasonable doubt of the existence of every element of the offense." *Jackson, supra,* 443 U.S. at 315–16, 99 S.Ct. at 2787. The state's evidence need only create an inference that permits "reasonable minds to believe the defendant guilty beyond a reasonable doubt." *State v. Ramsey, supra,* 368 S.W.2d at 418. Such evidence suffices to permit the trial court to submit the case to the trier of fact. *Id.*

Here, the prosecution, through no apparent fault of its own, could only present a very weak case with evidence too insubstantial to justify submission to the jury. Despite an apparently timely and compe-

tent investigation, the evidence sufficient to prove the defendant guilty beyond a reasonable doubt did not exist.

Having failed to prove one of the three prongs of the circumstantial evidence test, the state failed to proffer evidence sufficient to allow its submission to a jury, and we need not review the test's other requirements. The trial court thus committed reversible error in submitting the case to the jury. *Tibbs v. Florida,* 457 U.S. 31, 41, 102 S.Ct. 2211, 2217, 72 L.Ed.2d 652 (1982); *State ex rel. Ryan v. Holt,* 499 S.W.2d 821, 823 (Mo.App.1973); *State v. McClunie,* 438 S.W.2d 267, 268 (Mo.1969).

Accordingly, we must reverse the judgment of the trial court, and order the defendant discharged.

All concur.