**STATE of Missouri, Respondent,**

v.

**William JONES, Jr., Appellant.**

**No. WD 63842.**

Missouri Court of Appeals,
Western District.

Aug. 16, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 2005.

**450**

Kent Denzel, Columbia, for appellant.

Deborah Daniels, Asst. Atty. Gen., Jefferson City, for respondent.

Before JOSEPH M. ELLIS, Presiding Judge, PAUL M. SPINDEN, Judge and VICTOR C. HOWARD, Judge.

JOSEPH M. ELLIS, Judge.

The State charged Appellant, William Jones Jr. ("Jones"), with the Class D felony of abandoning a corpse, section 194.425.1.[1] A Boone County jury found him guilty as charged, and the circuit court sentenced him to a four-year term of imprisonment in the custody of the Missouri Department of Corrections. Jones appeals the circuit court's judgment of conviction, advancing two points relied on.

In his first point, which resolves his appeal, Jones asserts that, because he could not be found to have committed the charged offense beyond a reasonable doubt on the evidence presented at trial, the circuit court erred in overruling his motion for a directed verdict of acquittal at the close of the State's case.

"A directed verdict of acquittal is authorized only where there is insufficient evidence to support a guilty verdict." *State v. Morovitz*, 867 S.W.2d 506, 508 (Mo. banc 1993). "The function of the court is limited to determining whether there was sufficient evidence from which reasonable persons could have found defendant guilty as charged. In evaluating this issue, trial and appellate courts must view the evidence and all of its reasonable inferences in the light most favorable to the State, disregarding any evidence or inferences to the contrary." *Id.* (internal citations omitted). Resolution of this case also involves statutory interpretation. "Questions of statutory interpretation, of course, are questions of law, which this court reviews *de novo*." *State v. Harney*, 51 S.W.3d 519, 532 (Mo.App. W.D.2001).

Viewed in accordance with our standard of review, the facts of this case are straightforward. On the morning of December 31, 2002, Jones and his girlfriend drove to the rural Callaway County mobile home of Justin Eric Hazlett, Jones' friend and "fishing buddy" of seven or eight years, to pick up a wood-burning stove Hazlett had promised to give to Jones. Jones saw what appeared to be Hazlett lying on the front lawn, and he got out of the car to check on him. He thought that Hazlett, whose body was prone and facing upward, might be sleeping, unconscious after drinking heavily or having being beaten, or dead. He kicked the heel of one of Hazlett's shoes. When he noticed that Hazlett's body looked "kind of yellow" and that there was dried blood on his face and coming out of his nose, Jones concluded that Hazlett was dead. He then returned to his vehicle and drove away. He told his girlfriend that Hazlett was dead and, if asked, not to tell the police that they had been at Hazlett's house. Jones did not report the corpse's location to Callaway County law enforcement officials. Someone else did, apparently around noon the same day. Hazlett, who was last seen alive at a local gathering place called Crane's Store on the evening of December 30, had been shot twice in the head sometime between then and when Jones discovered his corpse the following morning.

The jury convicted Jones of violating section 194.425.1, which provides, in its entirety: "A person commits the crime of abandonment of a corpse if that person abandons, disposes, deserts or leaves a

---

1. All statutory references are to RSMo 2000.

corpse without properly reporting the location of the body to the proper law enforcement officials in that county." [2] As mentioned above, abandonment of a corpse is a Class D felony, § 194.425.2, and the circuit court sentenced Jones to a four-year term of imprisonment in the custody of the Missouri Department of Corrections.

Jones did not testify and presented no other evidence at trial. However, his motion for a directed verdict of acquittal at the close of the State's evidence was overruled, and this was assigned as error in his unsuccessful motion for new trial and point relied on, thus fully preserving the sufficiency issue for appellate review. *See State v. McClunie*, 438 S.W.2d 267, 268 (Mo.1969). Our primary objective in interpreting section 194.425.1 is to give effect to the General Assembly's intent, and we discern that intent from the plain and ordinary meaning of the statute's words. *State v. Grubb*, 120 S.W.3d 737, 739 (Mo. banc 2003). The plain and ordinary meaning of the words of a statute is their meaning "found in the dictionary ... unless the legislature provides a different definition." *Lincoln Indus., Inc. v. Dir. of Revenue*, 51 S.W.3d 462, 465 (Mo. banc 2001). In this regard, our Supreme Court's recent interpretation of section 194.425.1 in *State v. Bratina*, 73 S.W.3d 625 (Mo. banc 2002), is instructive.

In *Bratina*, the State alleged that the defendant, James Bratina, left his apartment in Jackson, Missouri, on January 15, 2001, at about 6:40 a.m., leaving behind his three-year-old daughter and the body of his deceased wife. 73 S.W.3d at 626. When Bratina left the apartment, he went to his place of work and returned about three to four hours later, at which time he called 911. *Id.* at 626, 628. Bratina was charged with the class D felony of abandonment of a corpse and the class A misdemeanor of endangering the welfare of a child in the second degree. *Id.* at 626. After he moved to dismiss the felony charge, arguing that section 194.425.1 was unconstitutionally vague, the trial court granted the motion and declared the statute to be void. *Id.* The State appealed, and the Missouri Supreme Court reversed, holding that the statute did not violate the due process clause since it gave Bratina fair notice of the conduct that it declared to be a crime. *Id.* at 626, 629.

After setting forth the text of section 194.425 in full, the Court began its analysis by noting that "[t]here is a question as to what conduct is made criminal by this statute." *Id.* at 626. To illustrate this, the Court recounted at length a familiar scene from *The Adventures of Huckleberry Finn*, in which Huck Finn and his friend Jim discovered a naked male body in a house located on a flooded island in the Mississippi River but left it where they found it without reporting it to anyone. *Id.* After canoeing over to the island, they came upon the house and entered through an upstairs window. *Id.* At daybreak, they looked in the window, and Huck described what they saw:

> There was something laying on the floor in the far corner that looked like a man. So Jim says: 'Hello, you!'
>
> It didn't budge. So I hollered again, and Jim says: 'De man ain't asleep— he's dead. You hold still.'
>
> He went, and bent down and looked, and says: 'It's a dead man. Yes, indeedy; naked, too. He's ben shot in the back. I reck'n he's ben dead two er three days.

---

**2.** Although the State had the option of charging and prosecuting Jones with having abandoned, disposed, deserted, or left Hazlett's corpse, the State chose to argue (and to hypothesize to the jury in the verdict director) only that Jones "left" Hazlett's corpse without reporting its location to county law enforcement officials.

Come in, Huck, but doan' look at his face—it's too gashly.'

I didn't look at him at all. Jim threw some old rags over him but he needn't done it; I didn't want to see him.

[The narrator then recounts how Huck and Jim made a 'good haul' of belongings in the house and then left:] I paddled over to the Illinois shore, and drifted down most a half a mile doing it. I crept up the dead water under the bank, and hadn't no accidents and didn't see nobody. We got home all safe.

*Id.* at 626–27 (internal citation omitted).

Turning to the words used in section 194.425.1, the Court then noted:

The concept of "abandonment" in the statute clearly is based upon a person having an interest in, or duty with respect to, the body. To abandon, the dictionary tells us, is "to cease to assert or exercise an interest, right or title to esp. with the intent of never again resuming or reasserting it ...." or "to forsake or desert esp. in spite of an allegiance, duty, or responsibility." The words that the statute uses to describe the concept of abandonment are "abandons, disposes, deserts or leaves." The first three of these words contain the concept that the person has a relationship or duty with respect to the body. To dispose of something implies that one has possession of it. Similarly, to desert—one of the synonyms of abandon—includes the concept of turning away

from or withdrawing support or disrupting the bond of attachment or duty.

*Id.* at 627 (footnotes omitted).

As to the last word used by the General Assembly in section 194.425.1 to describe the concept of abandonment ("leaves"), the Court noted that it was ambiguous when considered in isolation. *Id.* "Does it mean leaves," the Court asked, "as in what Huck and Jim did, or leaves, as in mortuary attendants carrying and leaving a body on the front porch of a decedent's home when the relatives fail to pay for its disposition?" *Id.* That is to say:

If Huck Finn and his friend Jim were real 21st century Missourians, might they be facing a D felony for abandonment of a corpse? They, after all, did 'leave' a corpse that they had found. Bratina makes a similar point, that someone walking down the street, an innocent bystander, would be committing a crime if he kept walking without reporting the corpse to the proper authorities.

*Id.* (original paragraph style omitted).

■ The Court resolved the ambiguity created by the legislature's use of the word "leaves" by observing that "leaves" was "not used in isolation, but along with the words 'abandons, disposes, deserts.'" *Id.* Applying the maxim of statutory construction known as *noscitur a sociis* ("it is known from its associates"),[3] the Court held that inasmuch as "these terms all have as part of their meaning a relationship or duty with respect to the dead

3. " 'The rule or maxim is to the effect that the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it. Under this rule of noscitur a sociis, general and specific words, capable of analogous meaning, when used together, take color from each other, so that general words are restricted to a sense analogous to the less general, and the meaning of a word may be enlarged or restrained by reference to

the object of the whole clause in which it is used.' " *Foremost Dairies, Inc. v. Thomason*, 384 S.W.2d 651, 660 (Mo. banc 1964) (quoting 66 C.J.S. *Noscitur a Sociis* 607, 608 (1950). This maxim "is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth" in statutory construction. *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961).

body," that was also the sense in which "leaves" was employed by the legislature. *Id.* & n. 5. Thus, the Court held that the term "leaves" also has as part of its meaning a relationship or duty with respect to the dead body.

Our Supreme Court went on to recognize that, on the facts before it, it was unnecessary to expressly rule on the question of "whether the statute, section 194.425, goes as far as to impose a duty on a stranger to notify the authorities when a dead body is discovered." *Id.* That was because Bratina's relationship or duty with respect to the corpse at issue was not that of a mere stranger or "innocent bystander." *Id.* Instead, the Court stressed, "[t]he body is that of his wife, the body was in his household, and he is the next of kin." *Id.* These facts, the Court held, were sufficient to impose a common law duty upon Bratina to properly care for the body of his dead wife. *Id.* at 627–28 (citing Percival E. Jackson, *The Law of Cadavers* 33–36 (2d ed.1950)).

■ The State contends that, in accordance with *Bratina*, Jones' close friendship to Hazlett created the necessary common law relationship or duty, arguing that although "friendship does not denote a legal or blood relationship like that of a husband and wife or parent and child, it is a relationship with an implied allegiance." However, this approach to the statute is erroneous because it looks to a relationship other than one involving the corpse. Since the bond or duty must be in relation to the corpse, Jones' friendship to Hazlett was irrelevant unless it imposed some duty on Jones to take care of Hazlett's corpse.

*See id.* at 627. We know of no duty that would impose an obligation on Jones to take care of Hazlett's corpse. Accordingly, that Jones had been Hazlett's friend while Hazlett was alive put him in no different legal position, vis-à-vis Hazlett's corpse, than had the two always been total strangers to each other.[4]

In this case, Jones had no common law responsibility for Hazlett's corpse, which he merely happened upon in Hazlett's front yard. Accordingly, here the court is called upon to decide whether section 194.425.1 imposes a duty, the violation of which constitutes a felony criminal offense, on a person to notify the proper county law enforcement authorities when he or she merely encounters what he or she has determined to be a dead body but has no common law relationship or duty with respect to its proper care or sepulcher. Although the Court in *Bratina* did not come out and simply say so due to the procedural posture of the case, a careful reading of the opinion makes it clear that the statute imposes no such duty because, as used in section 194.425.1, "leaves" was employed by the legislature in its more limited sense rather than in its broader sense. In other words, it was used in the sense of mortuary attendants carrying and leaving a body on the front porch of a decedent's home when the relatives fail to pay for its disposition, as opposed to what Huck and Jim did. Accordingly, as used in section 194.425.1, "leaves" should be construed to mean "put[s], place[s], deposit[s], or deliver[s] before or in the process of departing or withdrawing" or "cause[s] to be . . . in some specified condition," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE EN-

4. The record shows that the verdict director submitted by the State (and given by the trial court over objection by Jones) actually required the jury to find "that at the time defendant left the corpse, defendant was a friend of Justin Eric Hazlett." As just observed, this reflected an erroneous conception of section 194.425.1. However, in light of our disposition of this case on other grounds, we need not (and do not) decide whether this constituted prejudicial reversible error, either plain or preserved.

GLISH LANGUAGE UNABRIDGED 1287 (1993),[5] rather than "permit[s] to remain undisturbed or in the same position." *Id.*[6] Such a construction is consistent with our Supreme Court's observations in *Bratina*, where the Court strongly implied that to "leave" a corpse in the latter sense does not involve a sufficient "relationship or duty with respect to the dead body" for that conduct to be prohibited by section 194.425.1, while to "leave" a corpse in the former sense does. *Bratina*, 73 S.W.3d at 627. Indeed, this must be the case if the Court's extended discussion of Huck and Jim's act of leaving a corpse they had found (as opposed to a mortician's act of leaving a corpse on a nonpaying client's front porch) is to be given any effect or meaning by this court.

This is not, as argued in the dissent, a departure from the cardinal rule of statutory construction that courts will apply a word's plain and ordinary meaning unless the legislature makes clear that it intends a different meaning. Dissenting Opinion at 460. Rather, it simply acknowledges the fact that "leaves" has at least two plain and ordinary meanings (one broad and one narrow), and in *Bratina*, the Court strongly suggested (although it did not formally hold) that the more limited meaning was the one intended by the General Assembly.

For the foregoing reasons, it cannot be said that Jones "left" Hazlett's corpse as contemplated by the statute when he drove off after walking up to the body, kicking the heel of one of Hazlett's shoes, seeing the dried blood on Hazlett's head, and realizing that he was dead. He had not put, placed, deposited, delivered, or otherwise caused the body to be there before departing, and no law obligated him to take care of the body or to arrange for its sepulcher. He had only accidentally happened upon the corpse and merely permitted it to remain just as it was when he first discovered it. "There having been no substantial evidence of defendant's guilt defendant's motion for a directed verdict of acquittal should have been sustained." *State v. Irby*, 423 S.W.2d 800, 803 (Mo. 1968).

The dissent nevertheless argues for a much broader interpretation of the word "leaves"—one which would encompass both a mortician's act of leaving a corpse on a nonpaying client's front porch, *as well as* what Huck and Jim (and Jones) did. Dissenting Opinion at 459. The dissent asserts that because section 194.425.1 criminalizes conduct that is wrong in itself, or *malum in se*, to construe that word as we do here would thwart the statute's "commonly understood" purposes, noting that Jones did not "remain afar from and uninvolved with Hazlett's corpse," but "got involved with it" by getting out of his car to determine why the body was lying where it was and kicking the heel of one of Hazlett's shoes to try to arouse him. *Id.* at 459, 460. Citing multiple alternative dictionary definitions of "abandon," "desert," "dispose," and "leave," the dissent concludes that Jones violated section 194.425.1 when he withdrew this "voluntarily extended support and help" without subsequently reporting the location of Hazlett's corpse to county law enforcement officials in the plain and ordinary sense of those words. *Id.* at 459–60. We perceive this view to be incorrect for several reasons.

---

**5.** *See also* BLACKS' LAW DICTIONARY 801 (5th ed.1979) (defining "leave" as "[t]o put, place, deposit, deliver, or the like.")

**6.** *See also* BLACKS' LAW DICTIONARY 801 (5th ed.1979) (defining "leave" as "to let stay or continue" and "to suffer to remain subject to another's action, control, or the like.")

First of all, as noted *supra*, the dissent's interpretation is inconsistent with what our Supreme Court said in *Bratina* about the meaning of the word "leaves" as it is used in section 194.425.1, because Huck and Jim did just as much if not more with respect to the corpse they encountered as Jones did with Hazlett's corpse. That is, Huck and Jim did not "remain afar from and uninvolved with" the naked male body they encountered, but "got involved with it" by trying to determine why the body was lying where it was and yelling at the man to try to arouse him. After they determined that he was, in fact, dead due to a gunshot wound, Jim threw some old rags over the corpse in an attempt to spare Huck from the ghastly visage, and they departed without telling anyone what they had seen and done.

Second, the dissent's construction of the word "leaves" is heavily influenced by the definitions of two other words used in section 194.425.1—"abandons" and "deserts"—both of which may involve (but do not necessarily require) a prior act of control or possession on the part of the actor. *Id.* The dissent further defines the term "disposes," which is also used to describe the concept of abandonment in section 194.425.1, as meaning " 'assign[s] to a particular place or position[.]' " *Id.* at 459. As observed by the Court in *Bratina*, "[t]o dispose of something implies that one has possession of it." 73 S.W.3d at 627. Thus, even under the dissent's definition of the word, one cannot dispose of a corpse without *first* assuming possession or control of it in some fashion. Therefore, the term "disposes" was used in its plain and ordinary sense of "discard[s]" or "get[s] rid of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 654 (1993); BLACKS' LAW DICTIONARY 423 (5th ed.1979) (so defining "dispose[s] of").[7] Accordingly, the dissent's interpretation of the statute is not consonant with the ordinary meaning of the associated term "disposes."

Third, the dissent's approach imposes no concrete limitations on the scope of the statute, because it does not advise the public, the bar, or the bench "precisely how much interest one must have in a corpse to be deemed to have committed the crime of abandoning a corpse." Dissenting Opinion at 459. Suppose, for example, that instead of kicking the heel of one of Hazlett's shoes, Jones had yelled or clapped his hands at Hazlett's corpse, poked at it with a stick, or thrown a pebble at it. Would any or all of those acts constitute "protection, support, or help," *id.* at 459, such that their discontinuation was sufficient to constitute abandonment? And under those circumstances, would Jones properly be deemed to have had a sufficient interest in or relationship to the corpse to make him guilty of having committed a Class D felony, which is punishable, under section 558.011.1(4), by a term of imprisonment in the custody of the Missouri Department of Corrections of up to five years? As it is, under the dissent's interpretation of section 194.425, innocent bystanders or other strangers happening upon what appears to be a human body from a distance would naturally be more likely to simply ignore it rather than to come closer to attempt to ascertain whether the body was actually a corpse. So while our construction of the statute draws lines that make it unsatisfactory to the dissent (*see* Dissenting Opinion at 459, 460), the dissent's construction has its shortcomings as well.

Fourth, and perhaps most importantly, while it is clear that our Supreme Court's

---

**7.** No matter which definition is used, the facts of this case clearly establish that Jones could not be deemed to have disposed of Hazlett's corpse.

decision in *Bratina* compels this court to interpret the word "leaves" as used in section 194.125.1 in its more limited sense, even if it could be said that it is equally possible that the legislature intended that the word be construed in its broader sense, it really does not matter, because the statute would still be ambiguous, and the result would be the same.

█ It has been the law of this state for more than a century that criminal statutes must be construed strictly against the State and liberally in favor of the defendant.

> The question presented calls for the construction of a criminal statute. In doing so we are to determine the intent of the Legislature, but in making this determination 'it is a fixed rule that such statutes must be strictly construed against the state and liberally in favor of the defendant, and that no one is to be made subject to criminal prosecution by implication.'

*State v. Lancaster*, 506 S.W.2d 403, 404 (Mo.1974) (quoting *State v. Getty*, 273 S.W.2d 170, 172 (Mo.1954)).[8] This is particularly so where, as here, the criminal statute under consideration is ambiguous and is reasonably susceptible to more than one construction. "[W]hen ambiguity exists in criminal statutes they are to be construed more strictly against the state." *State v. Withrow*, 8 S.W.3d 75, 80 (Mo. banc 1999).

█ In practical terms, what does this rule of strict construction mean? For one thing, it means that "[s]tatutes defining crimes will not be interpreted as embracing any but those acts or omissions clearly described in the statute both within the letter and spirit of the law." *State v. Fredrickson*, 689 S.W.2d 58, 61 (Mo.App. E.D.1984). Such statutes may not be extended or enlarged by judicial interpretation so as to embrace persons and acts not specifically and unambiguously brought within their terms. *State v. Lloyd*, 320 Mo. 236, 7 S.W.2d 344, 346 (1928). It also means that "[i]f there is a fair doubt whether the act charged and proved is embraced within the prohibition, that doubt must be resolved in favor of the accused." *Fredrickson*, 689 S.W.2d at 61.[9]

The dissent, however, does not follow the rule of strict construction applicable to ambiguous criminal statutes. Rather than

---

**8.** *See also Goings v. Mo. Dep't of Corr.*, 6 S.W.3d 906, 908 (Mo. banc 1999) (internal quotation marks omitted) ("In construing the statute, we are guided by the principle that criminal statutes must be construed strictly against the [s]tate and liberally in favor of the defendant."); *State v. Bartley*, 304 Mo. 58, 263 S.W. 95, 96 (1924) ("Criminal statutes are to be construed strictly; liberally in favor of the defendant, and strictly against the state, both as to the charge and the proof. No one is to be made subject to such statutes by implication."); *State v. Reid*, 125 Mo. 43, 28 S.W. 172, 173 (1894) ("A familiar rule of construction of criminal statutes is that they should be strictly construed, and not extended or enlarged by judicial construction so as to embrace offenses and persons not plainly within their terms.")

**9.** This, too, has been the law of Missouri for over a century. *See, e.g., State v. Jones*, 899 S.W.2d 126, 127 (Mo.App. E.D.1995) ("Any doubt as to whether the act charged and proved is embraced within the prohibition must be resolved in favor of the accused."); *Anthony v. Kaiser*, 350 Mo. 748, 169 S.W.2d 47, 48 (1943) (quoting *State v. Taylor*, 345 Mo. 325, 133 S.W.2d 336, 341 (1939)) (" 'No person is to be made subject to [criminal] statutes by implication, and, when doubts arise concerning their interpretation, such doubts are to weigh only in favor of the accused.' "); *State v. Sibley*, 131 Mo. 519, 33 S.W. 167, 171 (1895) (Sherwood, J., concurring) (internal quotation marks omitted) (noting that the rule of strict interpretation of criminal statutes means that "all doubts concerning their interpretation are to preponderate in favor of the accused.")

strictly construing section 194.425.1 against the State and liberally in favor of the accused, the dissent reasons that the statute should be liberally construed in favor of the State and against the defendant since a broad interpretation could be deemed more beneficial to the public interest. Dissenting Opinion at 459. And rather than resolving in favor of the accused the substantial doubt as to whether the act charged and proved by the State was embraced within the statutory prohibition, the dissent concludes that this doubt must be resolved in favor of the State.

This court long ago rejected a similar argument in *State v. McClary*, 399 S.W.2d 597, 598 (Mo.App. W.D.1966), where the State charged the defendant with a misdemeanor for " 'operating a disposal area for garbage, rubbish and refuse, without making application for, and obtaining a license for a dumping ground.' " After closely examining the County Option Dumping Ground Law, this court observed: "One would normally expect that the legislature would want to include such a prohibition in a law of this nature and that it would declare it in clear and unmistakable language. Still the fact remains that this was not done. Whether this omission resulted from inadvertence or studied consideration we cannot say." *Id.* at 600. The court further noted that the rule of strict construction "must prevail even though courts may think that the legislature ought to have made a law more comprehensive and that by failing to do so it failed to accomplish a salutary purpose." *Id.* at 599. In reversing the defendant's conviction and ordering that he be discharged from his sentence, the *McClary* court concluded:

> For us to enlarge the terms of this law by construction to make it embrace the defendant and his conduct would be a flagrant violation of the rule that criminal statutes must be construed strictly against the state and liberally in favor of

the accused. We have no possible authority to construe this law as embracing an offense which is not already expressly written into it or so clearly, plainly and necessarily implied by the words the law employs that we can fairly say such offense is proscribed by the law beyond all rational doubt. What is charged against the defendant is not proscribed by this law. To read it into this law by construction would be for us to legislate rather than to adjudge, and this we are forbidden to do.

*Id.* at 600 (internal citations omitted).

■■■ The dissent argues that the *McClary* rationale and conclusion do not apply in this case due to the Missouri Supreme Court's observation, in *Bratina*, that section 194.425.1 criminalizes conduct that is *malum in se*. *See* Dissenting Opinion at 460, 461. However, a closer reading of *Bratina* demonstrates that the Court mentioned the *malum in se—malum prohibitum* distinction only to meet the defendant's constitutional due process argument that the statute (in particular, the phrases "proper notice" and "proper law enforcement officials") was so vague and uncertain that it did "not convey to him any understanding of his duties under the law." 73 S.W.3d at 628. "The standard for determining whether a statute is void for vagueness is whether the terms or words used in the statute are of common usage and are understandable by persons of ordinary intelligence." *Id.* Here, however, we are not faced with a facial void-for-vagueness challenge subject to that exacting standard, but simply a question of statutory construction. Moreover, the dissent cites no authority for the proposition that Missouri's long-standing and fundamental rule of strict construction applicable to ambiguous criminal statutes does not apply when the criminal statute being construed prohibits conduct that is *malum in se*.[10]

The Court in *Bratina* certainly did not say so, while in *McClary*, this court applied the rule despite the fact that the allegedly prohibited conduct (unlicensed operation of a public garbage dump) was arguably *malum in se* because it raised potential public health issues. In any event, this court held long ago that whether the forbidden act is considered *malum in se* or *malum prohibitum*, a criminal defendant has the presumption of innocence, which can be overcome only by evidence sufficient to prove the violation beyond a reasonable doubt. *City of Stanberry v. O'Neal*, 166 Mo.App. 709, 150 S.W. 1104, 1105–06 (1912).

Furthermore, while it is true that Missouri courts have sometimes gleaned legislative purpose by considering " 'the object the legislature seeks to accomplish with an eye towards finding resolution to the problems addressed therein,' " Dissenting Opinion at 460, we are still "governed by what the legislature said by its own enactment, even though we might think an important provision has been omitted through inadvertence" or the use of imprecise language. *McClary*, 399 S.W.2d at 600. As stated in *Gray v. Wallace*, 319 S.W.2d 582, 585 (Mo.1958): "We must, however, determine the legislative intent from what the legislature said and not from what we think the legislature intended to say or inadvertently failed to say." Accordingly, we are left with the Missouri Supreme Court's admonishment, in *State v. Rowe*, 63 S.W.3d 647 (Mo. banc 2002), that "[l]egislative intent can only be derived from the words of the statute itself." *Id.* at 650 (citing *Spradlin v. City of Fulton*, 982 S.W.2d 255, 258 (Mo. banc 1998)); *see also*

*State v. Krueger*, 134 Mo. 262, 35 S.W. 604, 606 (1896) ("We can only arrive at the intention of the legislature by the language used in the act[.]")

■ Thus, even if *Bratina* did not require this court to interpret "leaves" in its narrower sense, the rule of strict construction of criminal statutes would compel us to do so. In either case, the word "leaves" as used in section 194.425.1 would have to be construed to mean "put[s], place[s], deposit[s], or deliver[s] before or in the process of departing or withdrawing" or "cause[s] to be ... in some specified condition," rather than "permit[s] to remain undisturbed or in the same position." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1287 (1993).

The judgment of conviction is reversed and the defendant is ordered discharged from his sentence.

HOWARD, J., concurs.

SPINDEN, J., dissents in separate opinion filed.

PAUL M. SPINDEN, Judge, dissenting.

William Jones, Jr., is being released from his duty to report Justin Hazlett's corpse to authorities because he merely kicked the corpse. Had he dragged it, even a few inches—say, to Hazlett's front porch—he suddenly would have had a duty to report the corpse's location. This fine-haired distinction makes little sense in terms of public policy, and, more importantly, it is contrary to the General Assembly's intent in § 194.425.1, RSMo 2000,

---

**10.** As best we can tell, the rule appears to be that a more liberal construction in favor of the defendant should be given in the interpretation of penal laws which are *malum prohibitum* in their nature than in the interpretation of penal laws which prohibit *malum in se*

conduct, *State v. Knecht*, 28 Ohio N.P. (n.s.) 1, 5 (1930), not that the rule of strict construction is entirely inapplicable when the criminal statute being construed prohibits conduct that is *malum in se*.

which the Supreme Court has declared to be "commonly understood." *State v. Bratina*, 73 S.W.3d 625, 628 (Mo. banc 2002).

I have no quandary concerning whether or not § 194.425.1 imposed a duty on Jones to report the location of Hazlett's corpse to county authorities. The Supreme Court resolved the only ambiguity in the statute's language. *Id.* Applying the Supreme Court's teaching in *Bratina* along with the cardinal rule of statutory construction—that we discern the legislature's intent by applying the plain and ordinary meaning of the words that it uses in its statute—leads me to the certain conclusion that we should affirm the circuit court's judgment convicting Jones of abandoning Hazlett's corpse.

The teaching of *Bratina* is clear. We glean the underlying concept of abandonment of a corpse from the terms that the General Assembly used in § 194.425.1: "abandons, disposes, deserts, or leaves." Although "abandons," "deserts," and "leaves" are synonyms, the Supreme Court concluded that "leaves" was ambiguous because it is amenable to describing one's happening upon a body as well as a mortician's leaving a corpse on a nonpaying client's porch. *Id.* at 627. It concluded that "abandons," "disposes," and "deserts" all required "a person['s] having an interest in, or duty with respect to, the body," and that "leaves," therefore, should, too. *Id.* The Supreme Court resolved the ambiguity presented by "leaves" by declaring that, consistent with "abandons," "disposes," and "deserts," one can commit the crime of abandonment of a corpse by leaving it only if he has an interest in, or duty with respect to, the corpse.

The Supreme Court does not tell us how much interest one must have in a corpse to be deemed to have committed the crime of abandoning a corpse. Does he have to put or to place the corpse at the location before leaving it? We, however, are not left in a quandary on this matter. We can readily find the answer by employing the same dictionary that the Supreme Court used in *Bratina*.

The dictionary makes clear that one can abandon a corpse by "withdraw[ing] one's protection, support, or help from [it.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 2 (1993). When one takes steps to lend protection, support, or help, withdrawal of it constitutes abandonment. Significantly, under this definition, one need not have placed an object in a location to be deemed to have abandoned it. The same is true of "desert" and "dispose." One can *desert* a corpse by "turn[ing] away from (what has previously engaged [him]) esp[ecially] by withdrawing support or disrupting bonds of attachment or duty" or by "ABANDON[ING IT] . . .:[by] break[ing] away from or break[ing] off association with [it.]" *Id.* at 610. One can *dispose* a corpse by "assign[ing it] to a particular place or position[.]" *Id.* at 654. In the same way, one *leaves* a corpse by "withdraw[ing] . . . [him]self from [it] whether temporarily or permanently:[by] go[ing] away or depart[ing] from [it] . . .:[by] put[ting], plac[ing], deposit[ing], or deliver[ing it] before or in the process of departing or withdrawing [from it] . . .:[by] DESERT[ING], ABANDON[ING], FORSAK[ING IT] . . .:[by] terminat[ing] association with [it]:[by] quit[ting] the service of [it.]" *Id.* at 1287.

Jones did not remain afar from and uninvolved with Hazlett's corpse. He walked up to it and got involved with it, trying to determine why his friend was lying out on the ground in the cold of winter. He kicked Hazlett to try to arouse him. After deciding that Hazlett was dead, Jones withdrew his voluntarily extended support and help—as minimal as it

was—by walking away and instructing his girlfriend to lie to police about their encounter with Hazlett's body. In the plain and ordinary sense of "leaves"—understood in a sense consistent with "abandons," "disposes," and "deserts"—Jones abandoned Hazlett's corpse.

Thus, employing the plain and ordinary meaning of § 194.425.1's terms leads me to the certain conclusion that Jones left Hazlett's corpse, and § 194.425.1 imposed on him a duty to report the corpse's location to proper authorities. Indeed, when a statute uses a pedestrian word such as "leave," the General Assembly has a right to expect that we will apply the word's plain and ordinary meaning unless it makes clear that it intends a different meaning. Section 1.090, RSMo 2000. We have assured the legislature repeatedly that this is the cardinal rule of statutory construction. *State v. Blocker*, 133 S.W.3d 502, 504 (Mo. banc 2004).

After spending much time with the definitions of § 194.425.1's terms, the Supreme Court noted in *Bratina*, in its discussion of whether or not the statute was vague, that § 194.425.1 "criminalizes conduct that is wrong in itself," or *malum in se*. 73 S.W.3d at 628. This observation is significant in this case because, in a statute criminalizing conduct that is *malum in se*, "the evil that is being remedied is commonly understood." *Id.* I would agree that, given the nature of corpses, the evil underlying § 194.425.1 is certainly commonly understood. Because of health

risks involved with corpses, the inhumanity of leaving corpses lying around unattended, and the need for law enforcement authorities to investigate any criminal activity surrounding the corpse, authorities would want to know that Hazlett's corpse was lying unattended in his front yard. I think that they would want to know of a mortician's leaving a corpse on a nonpaying customer's porch, and I think that they surely would want to know about the body that Huckleberry Finn and his friend Jim found.[1]

To interpret "leaves" as applying only when the defendant put or placed the corpse in the location thwarts these "commonly understood" purposes. And it has the effect of encouraging an individual who happens upon a body, kicks it and determines that the person is deceased, to walk away without reporting the incident to anyone. I am very doubtful that this is what the General Assembly intended when it enacted § 194.425.1. We must avoid interpretations that defeat a statute's evident purpose. *State ex rel. Nixon v. Quik-Trip Corporation*, 133 S.W.3d 33, 37 (Mo. banc 2004); *Ming v. General Motors Corporation*, 130 S.W.3d 665, 668 (Mo.App. 2004).

We have always gleaned legislative purpose from the plain and ordinary meaning of a statute's words and always in consideration of "the object the legislature seeks to accomplish with an eye towards finding resolution to the problems addressed therein." *Gott v. Director of Revenue*, 5

---

1. The Supreme Court's extensive discussion of Huckleberry Finn is a bit confusing. The only point that I gleaned from its discussion of Mark Twain's character was that "leaves" is ambiguous because it can describe both what Huckleberry Finn did and a mortician's leaving a corpse on a nonpaying customer's porch. *Bratina,* 73 S.W.3d at 627. Significantly, the Supreme Court never said that Huckleberry Finn did not leave the corpse or

that § 194.425.1 would not apply to what he did. It merely raised, without answering it, the issue of whether or not he would face charges of abandoning a corpse were Huck Finn a real character living in Missouri today. To the extent that it somehow matters, it seems to me that Huck Finn could be prosecuted for abandoning a corpse under the plain and ordinary meaning of § 194.425.1's words.

S.W.3d 155, 159 (Mo. banc 1999). For example, when the Supreme Court considered the purpose of § 589.400, RSMo, requiring sex offenders to register, it declared the *"obvious* legislative intent" to be protection of "children from violence at the hands of sex offenders." *J.S. v. Beaird,* 28 S.W.3d 875, 876 (Mo. banc 2000) (emphasis added).

In light of the legislature's use of common terms in a *malum in se* statute, we err in resorting to the rule of lenity, a tool that is applicable only when all other rules of statutory construction fail. The rule of lenity applies to interpretation of statute only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what the legislature intended. *United States v. Wells,* 519 U.S. 482, 499, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). The rule does not require that a statute be given the narrowest meaning, but "it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers." *United States v. Brown,* 333 U.S. 18, 26, 68 S.Ct. 376, 92 L.Ed. 442 (1948).

Given the clear teaching of *Bratina,* we are not left to guess what the legislature intended in § 194.425.1. We merely need to give its words their fair meaning in accord with § 194.425.1's commonly understood purpose. Doing so should result in our affirming the circuit court's judgment convicting Jones of abandonment of a corpse.